LARRY CRAWFORD, ET AL.

V.

UNITED STEEL WORKERS, AFL-CIO, ET AL.

Record No. 820922

KERMIT STEVERS

V.

G. W. KEFFER, ET AL.

Record No. 820938

M. E. COLLINS, ET AL.

V.

LARRY CRAWFORD, ET AL.

Record No. 820948

October 11, 1985

Present: All the Justices

*James Newton Wilhoit, III (James L. Hutton; Ingram, Sutherland & Hutton*, on briefs), for appellants (Record No. 820922).

*Jeremiah A. Collins (Michael H. Gottesman; David M. Silverman; Robert H. Stropp, Jr.; C. Barry Anderson; R. Keith Neely; John S. Huntington; Bredhoff & Kaiser; Cooper, Mitch & Crawford; Goldsmith & Anderson*, on brief), for appellees (Record No. 820922).

*(R. Keith Neely; John S. Huntington*, on brief), for appellant. Appellant submitting on brief (Record No. 820938).

*James Newton Wilhoit, III (James L. Hutton; Ingram, Sutherland & Hutton*, on brief), for appellees (Record No. 820938).

*Jeremiah A. Collins (Michael H. Gottesman; Robert H. Stropp, Jr.; C. Barry Anderson; Bredhoff & Kaiser; Cooper, Mitch & Crawford; Goldsmith & Anderson*, on brief), for appellants (Record No. 820948).

*James Newton Wilhoit, III (James L. Hutton; Ingram, Sutherland & Hutton*, on brief), for appellees (Record No. 820948).

THOMAS, J., delivered the opinion of the Court.

## I. BACKGROUND

These three appeals arise out of a protracted, hotly contested labor dispute. In August 1977, United Steelworkers of America, AFL-CIO, Local 14948 (the Local), with approval of its parent organization, United Steelworkers of America AFL-CIO (the International), went on strike against Virginia Lime Company (Virginia Lime). The strike lasted eighteen months. Shortly after the strike began, Virginia Lime, in a proceeding separate from these appeals, secured an injunction against the Local to curtail improper conduct on the picket line. However, even after the injunc-

tion, complaints of wrongful activities on the part of the Local and its members continued.

The alleged wrongful activities served as the bases for the multi-count motion for judgment filed below. The plaintiffs[1] were individuals who worked at Virginia Lime while the strike was underway. In order to get to and from work, these individuals crossed the Local's picket line. The plaintiffs below are the appellants in Record No. 820922.

In their suit, the plaintiffs sought injunctive relief and money damages against the Local, the International, and certain individuals,[2] all of whom, save one, were members of the Local. Plaintiffs contended, in summary, as follows: that the suit arose under Code § 8.01-45 (generally referred to as the insulting words statute), as well as under the common law of Virginia; that the Local acted as agent for the International in all events complained of, thereby rendering the International responsible for the acts and omissions of the Local; that defendants violated the terms of a September 3, 1977 injunction which set forth rules regarding picketing; that defendants threatened plaintiffs with death and/or great bodily harm whenever any of the plaintiffs entered or exited Virginia Lime; that certain of the plaintiffs were shot at by certain of the defendants; that the defendants assaulted and battered the plaintiffs; that the defendants restrained or attempted to restrain the plaintiffs from exercising their right to free and unimpeded movement to and from the property of Virginia Lime; that the defendants violated Code § 8.01-45 by the use of insulting and abusive words aimed at the plaintiffs; and that the defendants intentionally inflicted emotional distress on the plaintiffs.

The case went to trial on May 26, 1981. After considering extensive and conflicting testimonial evidence, the trial court rejected virtually all of plaintiffs' contentions. More specifically, the court ruled as follows: that the motion to strike of defendants Russell B. White, L. A. Higgenbotham, C. E. Fields, W. T. Link, K. W. McManama, D. W. Myers, and L. R. Simpkins was

---

[1] The plaintiffs were Larry Crawford, Thomas E. Dudley, Charles Eaves, G. W. Keffer, Michael D. Kellison, Raleigh Newby, James E. Noonkester, Richard Lee Spicer, and Lewis H. Vaughn.

[2] The individual defendants were M. E. Collins, J. M. Radford, W. E. Sessor, Linwood Stewart, C. E. Fields, L. A. Higgenbotham, W. T. Link, K. W. McManama, D. W. Myers, L. R. Simpkins, Russell B. White, Jr., Jessie William Stevers, and Kermit Stevers. Kermit Stevers was the only defendant who was not a member of the Local.

granted; that the Local acted as agent for the International; that the words "scab," "scabby," "nigger," "bastard," and "son-of-a-bitch" were not actionable under Code § 8.01-45; that the words "cocksucker" and "motherfucker" were actionable under Code § 8.01-45; that there was no violation of Code §§ 40.1-53, 40.1-66, or 40.1-67, which concern picketing and right to work; that there was no intentional infliction of emotional distress; that there was no assault and battery; and that certain specified plaintiffs were entitled to recover from certain specified defendants $1,000.00 in compensatory damages and $10,000.00 in punitive damages. The three instant appeals question different aspects of the trial court's order.

In the first appeal, Record No. 820922, the original plaintiffs raise three issues which have been properly preserved for review by this Court: (1) whether the trial court erred in failing to find violations of Code §§ 40.1-53, 40.1-66, and 40.1-67; (2) whether the trial court erred in failing to find intentional infliction of emotional distress; and (3) whether the trial court erred in sustaining the motion to strike of White, Higgenbotham, Fields, Link, McManama, Myers, and Simpkins.

■ On brief, the original plaintiffs also assigned error to the trial court's ruling that the words "nigger," "bastard," and "son-of-a-bitch" were not actionable, and its failure to award damages for assault and battery. However, those matters were not mentioned in oral argument and counsel did not rely on his brief with regard to them. Therefore, in keeping with settled practice in the Commonwealth, we will not consider them here. *See Stevens* v. *Ford Motor Co.*, 226 Va. 415, 417 n., 309 S.E.2d 319, 320-21 n. (1983). *See also* Rule 5:35(d) effective August 1, 1985.

In the second appeal, Record No. 820938, Kermit Stevers, the only defendant not a member of the Local, appealed separately and raised the following issues which have been properly preserved for review by this Court: (1) whether the trial court erred in imposing liability on the basis of Code § 8.01-45, in that the two words found actionable were not defamatory; (2) whether the trial court erred in imposing liability on the basis of Code § 8.01-45, in that federal law preempts matters of defamation within a labor context; and (3) whether the trial court erred in imposing liability on the basis of Code § 8.01-45, in that such liability is barred by the First Amendment.

Stevers made three additional assignments of error. Two concern sufficiency of the evidence of his liability. The other contends that, within the labor context, punitive damages are barred by the First Amendment. However, these three matters were not mentioned in oral argument and counsel did not rely on his brief with regard to them. Therefore, the three additional issues will not be considered. *Stevens*, 226 Va. at 417 n., 309 S.E.2d at 320-21 n.

In the third appeal, Record No. 820948, the Local, the International, and the four other individual defendants who were found liable by the trial court raised the following issues which were properly preserved for review by this Court: (1) whether the trial court erred in imposing liability on the basis of Code § 8.01-45, in that the two words found actionable were not defamatory; (2) whether the trial court erred in imposing liability on the basis of Code § 8.01-45, in that federal law preempts matters of defamation within a labor context; (3) whether the trial court erred in imposing liability on defendants in violation of the First Amendment; (4) whether the trial court erred in holding the Local and International liable on common law agency principles; and (5) whether the trial court erred in holding the Local and International liable in light of the First Amendment and federal preemption of labor law.

The appellants in the third appeal made three additional assignments of error. One concerned sufficiency of the evidence and the two others concerned the award of punitive damages. However, these three matters were not mentioned in oral argument and counsel did not rely on his brief with regard to them. Therefore, we will not consider them. *Stevens*, 226 Va. at 417 n., 309 S.E.2d at 320-21 n.

Though from a technical standpoint this opinion must dispose of three appeals, the matter is simpler than that. The original plaintiffs contend, in essence, that relief should have been granted on more than a single ground and against more defendants. On the other hand, the defendants, those found liable, contend that they should not have been found liable on any ground. For reasons set forth below, we think the defendants are correct.

## II. FACTS[3]

The strike began on August 26, 1977, following a strike vote by the Local. On September 3, 1977, Virginia Lime secured an injunction against the strikers. The injunction laid down rules for the continuation of the strike. In November 1977, the Local voted to continue the strike. The strike was occasioned by acts of violence and intimidation. Ultimately, according to representations in oral argument, the Local and International were decertified as bargaining agents for the workers at Virginia Lime.

Larry Crawford testified about wrongful acts directed towards him. When he first went to the Virginia Lime plant to apply for work, he was stopped at the picket line where defendant Russell B. White told Crawford that the union was on strike and Crawford should "get the hell out of there." Kermit Stevers, another defendant, shot the "bird"[4] at Crawford, tried to run Crawford off the road, and called Crawford a "scab," "scabby son-of-a-bitch," and "bastard." Crawford said that William (Bill) Stevers also tried to run him off the road. William E. (Vick) Sessor called Crawford an "ugly-looking cocksucking bastard" and was present when a burning stick was thrown at Crawford's vehicle. Crawford said that as he went to and from work at Virginia Lime he was repeatedly called "son of a bitch," "motherfucker," or "bastard;" he was unable to identify any specific individual as having made these remarks.

Crawford said he felt threatened by the abusive language and the burning stick. He said also that as a result of the wrongful acts done to him he lost sleep, and became tense and anxious.

In response to Crawford's contentions, White did not testify. In his testimony, Kermit Stevers made no specific reference to Crawford's allegations. He did, however, admit to using curse words on

---

[3] The statement of the facts in these appeals is atypical for two reasons. First, the plaintiffs did not assert a common claim as to the several defendants. Instead, though many of the claims were similar, each individual plaintiff proved a separate and distinct set of facts against one or more of the defendants. Consequently, we, of necessity, must present nine separate factual accounts. Second, the plaintiffs prevailed on only a very limited portion of their claim. Thus, some of the facts must be viewed in favor of the plaintiffs while the others must be viewed in favor of defendants. As a result, we will summarize the facts as adduced by both sides.

[4] The "bird" is defined as "an obscene gesture of contempt made by pointing the middle finger upward while keeping the other fingers down." Webster's Third New International Dictionary, Unabridged (1981), Addenda at 60a.

occasion and also, on occasion, making a gesture he called the "bird." Vick Sessor made no specific reference to Crawford in his testimony. Vick Sessor did admit, however, that while he was on the picket line he overheard such words as "bastard, son-of-a-bitch, motherfucker." These are the precise words Crawford said were used against him, although he did not know who spoke them. Sessor also admitted that on occasion he used curse words. But he explained that he cursed back to others who first cursed him.

Thomas E. Dudley's evidence was as follows: He said that on crossing the picket line he was repeatedly cursed and called such things as "scab," "scabby son of a bitch," and "motherfucker." Dudley said that Jewel Radford attempted to run him off the road and that on separate occasions, Kermit Stevers also attempted to run him off the road. Vick Sessor hollered at Dudley, shot the "bird" at him, and called him such names as "motherfucker," "scab," and "scabby son of a bitch." Lynn Higgenbotham also cursed Dudley, and called him "scab" and "scabby son of a bitch." Dudley said that on one occasion, while driving from the plant, he saw a gun pointed at his vehicle; he did not say who pointed the gun.

As a result of the events to which he testified, Dudley became scared, nervous, depressed, and tense. Phyllis Dudley, plaintiff's wife, testified that her husband "became nervous and irritable," "snap[ped] at the children," and "went from 1½ packs to 3 packs of cigarettes per week."

In response to Dudley's testimony, Jewel Radford denied running anyone off the road. He also denied cursing anyone at the picket line. Vick Sessor said he did not recall running Dudley off the road. He admitted, however, that curse words were used on the picket line, but he contended such language was used by both sides. Higgenbotham did not make specific reference to Dudley's charges. However, he generally denied any wrongdoing.

Charles Eaves testified that he was called "bastard" and "cocksucker" on crossing the picket line. He said he was cursed almost every time he crossed the line. He was unable to say who called him those names. Jessie William (Bill) Stevers saw Eaves at the picket line and said, "You black nigger son of a bitch we'll get you." Marvin E. (Buddy) Collins threatened Eaves with a hammer and told him "We'll get your damn ass." Collins also said "We'll get you, motherfucker nigger." In addition, Vick Sessor said to Eaves, "We'll get your black ass." Jewel Radford drove in

front of Eaves on the highway and "stomped" on his brakes. Eaves got nails in his tires on crossing the picket line.

Eaves became nervous as a result of the acts directed at him. He started drinking heavily and couldn't sleep. He carried a gun for fear of being shot.

In response to Charles Eaves' testimony, Bill Stevers made no specific reference to Eaves but generally denied any wrongdoing. Buddy Collins denied threatening Eaves with a hammer and generally denied the allegations against him. Though Jewel Radford did not mention Charles Eaves by name, he denied running anyone off the road.

G. W. Keffer described several incidents in which he was victimized. In one incident, Keffer was hauling lime from the plant. Charlie Fields stepped into the road and raised a club as if to hit the windshield; apparently, upon recognizing Keffer, Fields lowered the club and stepped back. On another occasion, Higgenbotham, Radford, Collins, McManama, and two others blocked the road preventing Keffer from hauling a load of lime. Keffer's windshield was shot out by Kermit Stevers. Kermit also said over a "C.B." radio to Keffer, "There's that scabby SOB," "[w]e'll stop you from hauling that lime out of there." Indeed, every time Kermit Stevers passed Keffer on the road Stevers called Keffer a "son of a bitch." Bill Stevers, Vick Sessor, Lynn Higgenbotham, and Kenneth McManama, on different occasions, called Keffer a "scabby son of a bitch" and said they were going to get Keffer. McManama and Blevins (not a defendant) got on a C.B. radio and said to Keffer, "You scabby SOB, we'll get you tonight. We'll burn your barn; its Halloween tonight."

Keffer said he received threatening calls every night. He said the activities aimed at him made him nervous and caused uneasiness in his stomach. According to Keffer's daughter-in-law, he became more nervous, irritable, grouchy and preoccupied. She said he was grouchy with his grandchildren.

In response to Keffer's testimony, Charles Fields specifically denied that he raised a club as if to hit Keffer's windshield. Fields said that when Keffer drove by, he, Fields, was standing by the side of the road holding a whittling stick and that he made no gesture towards Keffer's truck. In his testimony, Jewel Radford made no specific reference to Keffer's charges concerning a roadblock. McManama likewise made no specific reference to Keffer but denied threatening anyone. Neither Higgenbotham nor Rad-

ford said anything specific about Keffer's testimony; they simply denied any wrongdoing. Kermit Stevers did not specifically deny shooting out Keffer's windshield or cursing Keffer; however, he generally denied any involvement in the strike. In his testimony, Vick Sessor made no specific references to Keffer's testimony; he did, however, admit hearing and using curse words while on the picket line. Bill Stevers did not make a specific response to Keffer's testimony; however, he denied any wrongdoing. The same is true for Higgenbotham and McManama. Blevins, who was not a defendant, did not testify.

Michael Kellison said his truck windows were shot out as he drove away from the picket line. Bill Stevers did the shooting. Vick Sessor said to Kellison, "You scabby son of a bitch, we're going to get you." Sessor met Kellison on the highway, drove on Kellison's bumper and continually flashed his lights from bright to dim. Kermit Stevers followed Kellison on the highway with bright lights on. This went on for two to three miles. Once, while leaving the plant, Kellison's truck was stopped by Bill Stevers and another; the men tried to open his doors. When they learned that Kellison had applied for a job, Bill Stevers called him a "son of a bitch." A shooting incident followed. Kellison said that when he crossed the picket line all of the picketers called him "son of a bitch," "bastard," and "cocksucker."

Kellison said he cannot sleep and does not go out as he did formerly. He wife said he used to sleep well; however, now he tosses and turns and keeps a gun.

In response to Michael Kellison's testimony, Bill Stevers specifically denied shooting into Kellison's truck and generally denied any other wrongdoing. Vick Sessor made no specific reference to Kellison's testimony. However, he admitted cursing on the picket line, on occasion; but generally denied any wrongdoing. Kermit Stevers denied tailgating Kellison with his bright lights on and generally denied any involvement in the strike.

McManama yelled out from the picket line within Raleigh Newby's hearing that he hoped "that nigger has good life insurance." That evening McManama followed Newby into town. Vick Sessor, Bill Stevers, Kermit Stevers, Jewel Radford, and Linwood (Chuckie) Stewart all called Newby "nigger," "motherfucker," "black son of a bitch," and "bastard." Jewel Radford called Newby "nigger, son of a bitch," and "no good motherfucker."

Newby was shot at in the parking lot at Virginia Lime but does not know by whom. He also got nails in his tires.

The events Newby described caused Newby to become scared, nervous, and depressed. His wife said he is really nervous, withdrawn from the children, does not sleep well, and is irritable.

In response to Raleigh Newby's testimony, Kenneth McManama denied making the statement ascribed to him by Newby. McManama claims he merely asked, out of curiosity, whether Newby's and another's group insurance was still in effect. McManama denied threatening anyone. Vick Sessor made no specific response to Newby's charges; however, he admitted that while on the picket line he overheard words such as "bastard, son-of-a-bitch, motherfucker." He even admitted that on occasion he used curse words while on the picket line. Jewel Radford did not make specific reference to Newby's testimony; however, he generally denied cursing anyone at the picket line.

Vick Sessor called James Noonkester an "ugly looking cocksucking bastard." Noonkester's brake line was cut and, at that time, Noonkester saw Kermit Stever's truck in the vicinity. Noonkester picked up nails in his tires. Once, when Noonkester crossed the picket line, a burning stick was thrown at his car.

As a result of the foregoing, Noonkester became nervous, lost sleep, developed a heart condition, and became irritable with his family. He took valium for his nerves and other medicine for his heart. He was unable to sleep and eat as usual.

In response to Noonkester's testimony, Vick Sessor made no specific reference to Noonkester. Sessor said he overheard, while on the picket line, such words as "bastard, son-of-a-bitch, motherfucker." He even admitted that, on occasion, he used such words. Kermit Stevers specifically denied tampering with Noonkester's brakes. Charles Fields denied putting nails in the road.

Richard Spicer was cursed every day and night he went in, called such names as "scabby son of a bitch," "cocksucker," "bastard," and "motherfucker." Jewel Radford stepped in front of Spicer's truck and said, "I'll get you, you scabby bastard." Vick Sessor called Spicer a "scabby son of a bitch." The same thing was said by Higgenbotham. Spicer's car got stuck in snow; Higgenbotham came upon him and said, "This is what we've been

waiting for you scabby son of a bitch." The next day, Spicer found all but one of the windows shot out of his car. Someone on the picket line threw nails in the road and Spicer got some in his tires.

Spicer became nervous, sick, troubled, and upset. He suffered headaches, high blood pressure, and feared for his life.

In response to Richard Spicer's testimony, Jewel Radford, without specifically mentioning Spicer, denied cursing anyone. Vick Sessor made no specific reference to Spicer's testimony; however, he said that while on the picket line he overheard such words as "bastard, son-of-a-bitch, motherfucker." He even admitted using such words, on occasion. Higgenbotham denied cursing Spicer and denied vandalizing Spicer's car.

Lewis Vaughn was a former member of the union. He was cursed every day he crossed the picket line. He was called "scabby son of a bitch," and "scabby bastard." He got nails in his tire from the picket line. His car was shot at. Firecrackers were thrown under his car. Vick Sessor called him "a puny scabby son of a bitch." Jewel Radford, with a hammer in his hand, said, "Get out of the car and I'll knock your goddamn brains out."

Vaughn became nervous, lost sleep, developed high blood pressure, and became depressed. He received medical treatment for high blood pressure and depression. His sex life suffered.

In response to Vaughn's testimony, Vick Sessor made no specific reference to Vaughn. He did, however, admit overhearing, on the picket line, such words as "bastard, son-of-a-bitch, motherfucker." He even admitted that on occasion he used such language. Jewel Radford specifically denied threatening Vaughn. Further, Radford denied cursing anyone at the picket line.

The Local was involved in and aware of the events that took place during the strike. The Local called the strike. Jewel Radford was president of the Local and Vick Sessor was vice president. Either singly or in groups, members of the Local did many of the acts complained of by plaintiffs.

The involvement of the International is much different. The International representative recommended against striking. The Local disregarded this advice and voted to strike. The International representative advised the men to conduct themselves in an orderly fashion on the picket line. He told them not to drink and not to use abusive language. Moreover, the men were advised that if a car approached the picket line they could ask the occupant not to

cross but they could not do more than that. The International representative said he was in frequent telephone contact with the Local president who advised that there were no problems. Though the International sent strike benefits to the Local, the benefits were in a weekly lump-sum check which was deposited in the Local's account. Funds were disbursed to needy workers without any input or control on the part of the International.

## III.  DISCUSSION

### A.  *Preemption*

The relief granted by the trial court was based on pure speech, not conduct, but speech — standing alone. Moreover, the speech upon which liability was based occurred in the midst of a labor dispute. Further, the trial court did not rule that the words complained of were defamatory. Instead, the court said that the words "cocksucker" and "motherfucker" were actionable because they tend to violence and breach of the peace in violation of Code § 8.01-45. These factors all bear upon the preemption question.

On appeal, Kermit Stevers, the Local, the International, and the other defendants argue that the trial court could not award relief on the basis of the two words mentioned above because of the preemption doctrine. They argue that federal labor policy permits robust debate and the use of vile and abusive language within the confines of a labor dispute and that only knowing falsehoods or statements made with reckless disregard for their truth or falsity could serve as the basis for liability. We agree.

The rules regarding permissible speech within the context of labor disputes can be readily distilled from two leading Supreme Court opinions: *Linn* v. *Plant Guard Workers*, 383 U.S. 53 (1966), and *Letter Carriers* v. *Austin*, 418 U.S. 264 (1974). These two opinions essentially bracket the problem, placing the upper and lower limits of state control over speech used in labor disputes.

Though in *Linn* the Supreme Court said state jurisdiction was not preempted, plaintiffs' reliance on that opinion is misplaced. This is so because *Linn* plainly set standards that were not met in the instant appeal.

Linn was an assistant general manager of Pinkerton's National Detective Agency, Inc. A campaign was underway to organize Pinkerton's Detroit employees. In the midst of that campaign, the

organizers circulated a leaflet which accused Pinkerton's managers of certain misconduct, including depriving employees of their right to vote in certain National Labor Relations Board (NLRB or Board) elections, robbing employees of pay increases, and lying to employees. Linn sued. He alleged he was one of the managers referred to in the leaflet and that the statements concerning him were "wholly false, defamatory and untrue" and that the defendants knew the statements were untrue. Linn prayed for $1,000,000 in damages on the ground that the statements were libelous *per se*.

The district court concluded that exclusive jurisdiction lay with the Board and dismissed the complaint. The court of appeals affirmed. The Supreme Court reversed. Though the Supreme Court reversed, it carefully set forth the policy considerations that surround speech within the context of a labor dispute and described the *only* situation in which a state court could exercise jurisdiction over a defamation action arising out of such a dispute.

With regard to the policy considerations, *Linn* first focused upon the nature of labor disputes:

> *Labor disputes are ordinarily heated affairs*; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are *frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions*. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with *imprecatory language*.

*Linn*, 383 U.S. at 58, *citing Cafeteria Union* v. *Angelos*, 320 U.S. 293, 295 (1943)(emphasis added).

Next, the Court considered the NLRB's handling of speech within the context of labor disputes and concluded that the Board "has allowed wide latitude to the competing parties." *Linn*, 383 U.S. at 60. The Court also said the Board has concluded "that epithets such as 'scab,' 'unfair,' and 'liar' are commonplace in these struggles. . . ." *Id.* at 60-61. The Court summed up its review of Board treatment of speech within labor disputes as follows:

[A]lthough the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false. . . . In such case the one issuing such material forfeits his protection under the Act.

*Id.* at 61 (citations omitted).

The Court then focused on Congressional policy regarding "union speech." In that regard the Court recognized "a congressional intent to encourage free debate on issues dividing labor and management." *Id.* at 62. It made reference to this nation's profound commitment to uninhibited, robust, and wide-open debate, debate that "may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *Id., quoting New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964). The Court then concluded by saying that "*the most repulsive speech enjoys immunity* provided it falls short of a deliberate or reckless untruth." *Linn*, 383 U.S. at 63 (emphasis added).

In order to effectuate the policy concerns discussed in *Linn*, the Court concluded that state libel actions were preempted in all but a narrow class of cases. Such state proceedings were held permissible only where they were limited to "redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false." *Id.* at 61. The Court adopted by analogy, for use in such cases, the *New York Times Co.* v. *Sullivan* standards. *Linn*, 383 U.S. at 65.

Thus, *Linn* established a rule of partial preemption. Finally, *Linn* expressly reserved the right to consider, in a future case, whether total preemption of such cases was the only effective method of protecting the policy concerns announced in *Linn. Id.* at 67.

In *Letter Carriers*, the Court, applying the principles announced in *Linn* to facts somewhat similar to those in the instant appeal, broadened the sweep of preemption in this class of cases. *Letter Carriers* was a Virginia case, 213 Va. 377, 192 S.E.2d 737 (1972). There, a postal worker, who was not a member of the postal union, complained that his name was repeatedly listed in a union newsletter under the heading, "List of Scabs," and that the

definition of scab[5] supplied by the newsletter, including such words as "traitor," was false and defamatory. This Court agreed and upheld damage awards to Austin and two others. The Supreme Court reversed.

The Supreme Court said that the issue in *Letter Carriers* was "the extent to which state libel laws may be applied to penalize statements made in the course of labor disputes without undermining the freedom of speech which has long been a basic tenet of federal labor policy." *Letter Carriers*, 418 U.S. at 270. In resolving this issue, the Court made a careful review of *Linn*, in which it reemphasized the concerns expressed there that "unrestricted libel actions under state law could easily interfere with federal labor policy;" that Congress and the NLRB had expressly fostered the "freewheeling use of the written and spoken word" in labor disputes; and that federal policy favored "uninhibited, robust and wide-open debate in labor disputes. . . ." *Letter Carriers*, 418 U.S. at 271, 272, and 273.

Next, *Letter Carriers* made clear that *Linn* is to be given broad, not narrow, application. Justice Marshall said that the application of *Linn* cannot turn on some abstract notion of a labor dispute; instead, "application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the

---

[5] The definition reads as follows:

After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a scab.

A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. *The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.*

*Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class!*

*Letter Carriers*, 418 U.S. at 268 (emphasis in original).

federal labor laws leading to protection for freedom of speech are significantly implicated." *Letter Carriers,* 418 U.S. at 279.

After setting forth the foregoing items, the Supreme Court explained that *Letter Carriers* had to be reversed for two reasons: first, because a jury instruction defining malice did not comport with *New York Times Co.* v. *Sullivan,* and second, because, upon the Court's independent analysis, the allegedly defamatory statements were not false statements of fact and thus could not support liability.

The second basis for reversing *Letter Carriers* is the primary reason we must reverse the judgment entered in favor of plaintiffs by the trial court in the instant case. In *Letter Carriers,* Austin argued that the definition of "scab" charged him with having "rotten principles," lacking "character," and being a "traitor." Austin said those statements were untrue and that the union knew they were untrue. The Supreme Court rejected his argument. The Court explained that "*Linn* recognized that federal law gives a union *license to use intemperate, abusive, or insulting language* without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Letter Carriers,* 418 U.S. at 283. It then said that the "*sine qua non* of recovery for defamation in a labor dispute under *Linn* is the existence of falsehood." *Letter Carriers,* 418 U.S. at 283.

The Court concluded that the language complained of by Austin could not be construed as representations of fact. *Id.* at 284. According to the Court, the language complained of by Austin was merely "loose language" and that to use such language is not to falsify facts.

> The definition's use of words like "traitor" cannot be construed as representations of fact. As the Court said long before *Linn,* in reversing a state court injunction of union picketing, "*to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies — like 'unfair' or 'fascist' — is not to falsify facts.*" *Cafeteria Employees Local 302* v. *Angelos,* 320 U.S. 293, 295 (1943). Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. *Expression of such an opinion,*

*even in the most pejorative terms, is protected under federal labor law.*

*Id.* at 284 (emphasis added). In support of this view, the Court also cited *Greenbelt Cooperative Publishing Assn.* v. *Bresler*, 398 U.S. 6 (1970). In *Bresler*, a plaintiff had recovered because an action he took was described as "blackmail." The Court said use of the word "blackmail" could not be the basis of a libel judgment because the word did not convey a false statement of fact. The Court wrote:

> "It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable."

*Letter Carriers*, 418 U.S. at 285, *quoting Bresler*, 398 U.S. at 14 (footnote omitted). *See also Curtis Publishing Company* v. *T. B. Birdsong*, 360 F.2d 344 (5th Cir. 1966) (Court of Appeals said use of the word "bastard" to describe police could not reasonably have been read to accuse the plaintiffs of having been born out of wedlock). *Letter Carriers* reasoned it was likewise impossible for any reader to think that Austin was being accused of the criminal offense of treason. *Letter Carriers*, 418 U.S. at 285.

By the same token, the words upon which the trial court fashioned liability here will not support recovery. The words are disgusting, abusive, repulsive, and are in no way condoned by this Court. Nevertheless, they cannot reasonably be understood, under the circumstances of this labor dispute, to convey a false representation of fact. To call a person a "cocksucker" does not, under the circumstances of this labor dispute, convey the false representation that the individual engaged in sodomy. Nor does calling a person a "motherfucker," under the circumstances of this case, convey the false representation that the person engaged in incest. Because this was a labor dispute and considering the way in which

the words were used, these repulsive words will not support liability. The trial court should have stricken the claim based on violation of Code § 8.01-45.

## B.  *Plaintiffs' Other Theories of Liability*

### 1.  *Violation of Picketing and Right to Work Statutes*

■ The plaintiffs contend the trial court erred in failing to find a violation of Code §§ 40.1-53, -66, and -67. The trial court said it found no liability on the part of any defendants for violation of the cited code sections. The trial court made the correct ruling with regard to these matters.

Code § 40.1-53 provides as follows:

> No person shall singly or in concert with others interfere or attempt to interfere with another in the exercise of his right to work or to enter upon the performance of any lawful vocation by the use of force, threats of violence or intimidation, or by the use of insulting or threatening language directed toward such person, to induce or attempt to induce him to quit his employment or refrain from seeking employment.

> No person shall engage in picketing by force or violence, or picket alone or in concert with others in such manner as to obstruct or interfere with free ingress or egress to and from any premises, or obstruct or interfere with free use of public streets, sidewalks or other public ways.

> Any person violating any of the provisions of this section shall be guilty of a misdemeanor, and punished accordingly.

> Notwithstanding the punishments herein provided any court of general equity jurisdiction may enjoin picketing prohibited by this section, and in addition thereto, may enjoin any picketing or interference with lawful picketing when necessary to prevent disorder, restrain coercion, protect life or property, or promote the general welfare.

This statute does not provide for a civil action for damages. It is a quasi-criminal statute, the violation of which is punishable as a misdemeanor. In addition to providing for criminal penalties, it also provides for injunctive relief. We will not read more into the statute than is written. The trial court was correct in finding no

liability since the statute did not provide for the relief sought by plaintiffs.

■ Code §§ 40.1-66 and -67 are part of Article 3 of Chapter 40 which is concerned with "Denial or Abridgement of Right to Work." Code § 40.1-66 provides as follows:

> Any person, firm, association, corporation, or labor union or organization engaged in lockouts, layoffs, boycotts, picketing, work stoppages or other conduct, a purpose of which is to cause, force, persuade or induce any other person, firm, association, corporation or labor union or organization to violate any provision of this article shall be guilty of illegal conduct contrary to public policy; provided that nothing herein contained shall be construed to prevent or make illegal the peaceful and orderly solicitation and persuasion by union members of others to join a union, unaccompanied by any intimidation, use of force, threat of use of force, reprisal or threat of reprisal, and provided that no such solicitation or persuasion shall be conducted so as to interfere with, or interrupt the work of any employee during working hours.

Code § 40.1-67 sets forth relief available for violation of § 40.1-66 or any other provisions of Article 3. It reads as follows:

> Any employer, person, firm, association, corporation, labor union or organization injured as a result of any violation or threatened violation of any provision of this article or threatened with any such violation shall be entitled to injunctive relief against any and all violators or persons threatening violation, and also to recover from such violator or violators, or person or persons, any and all damages of any character cognizable at common law resulting from such violations or threatened violations. Such remedies shall be independent of and in addition to the penalties and remedies prescribed in other provisions of this article.

Given the language of these two provisions, the plaintiffs could have alleged a cause of action for money damages based on the violation of § 40.1-66. However, we read the trial court's decision to be a factual finding that plaintiffs did not prove their claim.

We have reviewed the conflicting evidence in this case. We cannot say that the trial court's conclusion is plainly wrong or without

evidence to support it. Therefore, we must affirm its decision which found no liability on the part of any defendant for the violation of Code §§ 40.1-66 and -67.

### 2. *Intentional Infliction of Emotional Distress*

■ In its Final Order the trial court found "no liability on the part of any Defendant for intentional infliction of emotional distress." The plaintiffs say this was error. We disagree; in our view the ruling must be affirmed.

The parties agree that *Womack* v. *Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974), sets forth the rules for recovery for intentional infliction of emotional distress absent physical injury. But as appellees in appeal No. 820922 argue, the court's ruling was factual, not legal. In the trial court's view, the plaintiffs did not prove their case on this issue. The evidence was in conflict as to the nature and extent of defendants' behavior. Consequently, we cannot say that the trial court's conclusion was plainly wrong. We will affirm its decision denying recovery for intentional infliction of emotional distress.

### IV. CONCLUSION

In light of the foregoing rulings, we need not consider the other issues raised by these appeals. As a result of our rulings, the judgments in favor of plaintiffs will be reversed and final judgments for defendants entered here.

Record No. 820922—*Affirmed*.
Record No. 820938—*Reversed*.
Record No. 820948—*Reversed*.

COCHRAN, J., concurring.

■ I reach the same result as the majority solely by application of Virginia law. We have long held that an action for insulting words under Code § 8.01-45 and its predecessors is treated in all respects as a common-law action for slander or libel, with the exception that no publication is required in an action for insulting words.

The trial of an action for insulting words is completely assimilated to the common law action for libel or slander, and

from the standpoint of the Virginia law it is an action for libel or slander.

*Carwile* v. *Richmond Newspapers*, 196 Va. 1, 6, 82 S.E.2d 588, 591 (1954); *see also Shupe* v. *Rose's Stores*, 213 Va. 374, 375, 192 S.E.2d 766, 767 (1972); *M. Rosenberg & Sons* v. *Craft*, 182 Va. 512, 528, 29 S.E.2d 375, 382-83 (1944); *W. T. Grant Co.* v. *Owens*, 149 Va. 906, 913-14, 141 S.E. 860, 863 (1928). The statute itself is now a useless appendage to the common law, an obsolete vestige of the proclivity for duelling which initially prompted the legislature to enact the law rewarding the victim for enduring an insult and penalizing the offender for the criminal act of provoking a breach of the peace. *See* Note, *The Actionable Words Statute in Virginia*, 27 Va. L. Rev. 405, 414 (1941).

Only false utterances are actionable under the common law of defamation. *See Rosenberg*, 182 Va. at 518, 29 S.E.2d at 378 (five classes of defamatory language). Accordingly, an action under the insulting words statute can be maintained only on the basis of a false statement. An epithet, however repulsive or intemperate, used to convey the speaker's contempt for another, is not defamatory when it cannot reasonably be understood to convey its literal meaning. When uttered in this context, such an expression is not a representation of fact, the truth or falsity of which is capable of proof.

Although use of the two offensive words upon which the judgments in the present cases were based may have tended to violence and breach of the peace, as the trial court held, they are not actionable under the insulting words statute because, in the context in which they were spoken, they are incapable of defamatory meaning. Therefore, the question whether such an action would be preempted by the federal labor laws is moot.

RUSSELL, J., dissenting:

I disagree with both the plurality opinion and the concurring opinion. The language used by the defendants is intolerable by any civilized standard. Taxes, military service, and conformity to the law may be a high price to pay for life in an orderly society, but the compensating benefits of peace and public order are thought by most citizens to be worth the price. Internal peace and public order, indeed, are the principal benefits the State has to

offer us in exchange for its numerous constraints on our freedom to do and say precisely what we want.

The words spoken by the defendants were like physical blows. They were, in themselves, foul-mouthed violence tantamount to an assault. No free man or woman should be expected to endure them without redress. Language of this kind, even in a relatively permissive age, may be expected to incite prompt retaliation. Such words are true "fighting words" because of their propensity to provoke an immediate breach of the peace, which is no trivial matter in light of the tendency of many of our citizens to keep and bear arms.

Although the victim of such a verbal assault may be justifiably outraged, our laws do not permit him to respond with physical violence. We tell the outraged victim that mere words, however grievous, will not justify a physical attack, *Roark* v. *Commonwealth*, 182 Va. 244, 252, 28 S.E.2d 693, 696 (1944), and that duels have been unlawful for well over two hundred years, *see Lambert's Case*, 36 Va. (9 Leigh) 603, 605 (1838). Instead, we tell the outraged victim to go to law. We tell him that the insulting words statute, Code § 8.01-45,[6] is the remedy provided by our social compact, and that in lieu of any right of self-help which he might have enjoyed in a primitive society, the civilized State in which he lives will permit him to recover such compensatory and punitive damages as a jury of his peers may think the outrage worth.

Without suggesting an alternative, the Court today destroys that remedy. The plurality opinion, ignoring the most recent decision of the United States Supreme Court on the subject, takes the position that the remedy is preempted by federal law because the tort was committed in the course of a labor dispute. The concurring opinion, applying dicta in our former cases out of context, simply concludes that the insulting words statute does not mean what it plainly says.

In *Letter Carriers* v. *Austin*, 418 U.S. 264 (1974), a case arising in Virginia, a divided United States Supreme Court held that defamatory words uttered in the context of a labor dispute were protected by federal labor law in the absence of "New York Times malice." The plurality opinion considers *Letter Carriers* to

---

[6] § 8.01-45: "All words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace."

be controlling, makes no mention of later decisions, and gives no consideration to the overriding state interest in preserving internal peace and public order from the threat of violence ignited by true "fighting words." The plurality merely concludes that the foul epithets shouted by the defendants here would not "support liability" because nobody would believe them to be true, and federal labor law had preempted the plaintiffs' remedy in any event. That interpretation ignores a distinction between "fighting words" and defamatory words which the United States Supreme Court has recognized for over forty years.

In *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942), the Court held that the Constitution affords no protection to certain well-defined classes of speech, including the lewd and obscene and insulting or fighting words *which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Id.* at 572-73. *Chaplinsky* involved an appeal from a conviction under a state law penalizing "offensive, derisive and annoying words." The New Hampshire Supreme Court, however, had narrowed the application of the law to words which "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Id.* at 573. Accepting New Hampshire's interpretation of its own law, a unanimous Supreme Court held that the control of verbal conduct likely to cause violence lies within the domain of state power. *Id.* at 573. *Chaplinsky* remains authoritative with regard to a state's right to control true "fighting words."

Two later cases are instructive with respect to the distinction between "fighting words" and words which are merely defamatory. In *Gooding* v. *Wilson*, 405 U.S. 518 (1972) and *Lewis* v. *City of New Orleans*, 415 U.S. 130 (1974), divided courts struck down, as vague and overbroad, state laws designed to penalize insulting words. In both cases, the majority took the position that there was danger that the laws might be employed to punish constitutionally protected speech because, and only because, the state courts had not adopted precise definitions of the statutory terms restricting their application to true "fighting words," as New Hampshire had done in *Chaplinsky*. The message seems clear enough.

*Farmer* v. *Carpenters*, 430 U.S. 290 (1977), decided three years after *Letter Carriers* but not mentioned by the plurality, is controlling on the issue of federal preemption. There, a dissident

worker recovered damages from a union for inflicting severe emotional distress by, among other things, subjecting him to "frequent public ridicule" and "incessant verbal abuse." *Id.* at 293. The union contended that its verbal onslaughts were privileged because uttered in the course of a labor dispute and that the plaintiff's state remedy was preempted by federal labor law. The state appellate court agreed with the union, taking the view that the plurality takes today. The Supreme Court unanimously reversed, refusing to apply the preemption doctrine to activity that touched "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." 430 U.S. at 296-97 (quoting *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 243-44 (1959)). Justice Powell wrote, for the Court:

> Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute . . . and thus there is no risk that state damages actions will fetter the exercise of rights protected by the NLRA. On the other hand, our cases consistently have recognized the historic state interest in "such traditionally local matters as public safety and order . . . ." And, as with the defamation actions preserved by *Linn*, state-court actions to redress injuries caused by violence or threats of violence are consistent with effective administration of the federal scheme: Such actions can be adjudicated without regard to the merits of the underlying labor controversy.

*Id.* at 299-300 (citations omitted).

Thus, if our insulting words statute is restricted in its operation to true "fighting words," words having a tendency to provoke an immediate breach of the peace, as I think it is, its remedy is clearly not preempted by federal labor law.

The concurring opinion relies on dicta in a line of cases beginning with *W. T. Grant Co.* v. *Owens*, 149 Va. 906, 141 S.E. 860 (1928), to hold that the insulting words statute is assimilated to an action for libel or slander *for all purposes*, and that it thus affords no remedy for true "fighting words," notwithstanding the express terms of the statute.

That view overlooks the profound difference between true "fighting words" and words which are merely defamatory. "Fighting words," such as those used here, do not tend to injure the victim's reputation, character, social standing, or means of earning a living. Rather than degrading the victim in the estimation of his peers, "fighting words" may arouse sympathy for him in bystanders who overhear the words and provoke them to join with him in a prompt and violent assault on the speaker. The State's interest in controlling such words is the paramount one of preserving public peace and order in the community. By contrast, defamatory words are actionable because of the injury they do to the victim's private reputation, and the State's interest in them extends only to affording its citizens a just remedy for their private injuries.

We have said repeatedly, in the context of words merely defamatory in character, that an action under the insulting words statute is assimilated to a common-law action for libel and slander. But we have never made that statement in a true "fighting words" case, this being the first such case to come before us since we decided *W. T. Grant* in 1928. An analysis of the facts in all the cases based on the insulting words statute which have come before us since *W. T. Grant* makes clear that each of them, including all those relied on by the concurring opinion, involved words which were either defamatory *per se* or *per quod*; and, if published, would have formed a basis for a common-law action for libel or slander independent of the insulting words statute.[7]

---

[7] Since 1928 when this Court stated in *W. T. Grant* that an action for insulting words is completely assimilated to the common law action for libel and slander, 52 cases involving the insulting words statute have been decided. A careful search of those cases discloses that none dealt with true "fighting words," but all dealt with defamatory words. For example, in the following cases, we have specifically stated that an action for insulting words is assimilated to a common-law action for slander or libel: *id.* (plaintiff accused of taking money from employer); *Rosenberg v. Mason*, 157 Va. 215, 160 S.E. 190 (1931) (plaintiff accused of taking money from employer); *Guide Publishing Co. v. Futrell*, 175 Va. 77, 7 S.E.2d 133 (1940) (statement that an unmarried woman was married and a mother); *M. Rosenberg & Sons v. Craft*, 182 Va. 512, 29 S.E.2d 375 (1944) (statement that plaintiff owed money, past due); *Darnel v. Davis*, 190 Va. 701, 58 S.E.2d 68 (1950) (plaintiff accused of trespass); *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588 (1954) (plaintiff, an attorney, accused of unprofessional conduct); *Weaver v. Finance Company*, 200 Va. 572, 106 S.E.2d 620 (1959) (statement that the plaintiff was in default on a loan); *Letter Carriers v. Austin, Et Al.*, 213 Va. 377, 192 S.E.2d 737 (1972) (plaintiff called a "scab," accompanied by a highly uncomplimentary definition of that term, a classic in the labor movement, written by Jack London); *Shupe v. Rose's Stores*, 213 Va. 374.

It may fairly be argued that some of these cases involved words which, in addition to their tendency to defame, might also provoke a breach of the peace, depending on the surrounding circumstances. But it is beyond question that each of them involved words which had, or allegedly had, the effect of damaging the plaintiff's reputation, character, standing in the community, or ability to earn a living. For that reason, they would have been proper subjects for actions of libel or slander. Our statements that actions under the statute were assimilated to actions for defamation were, therefore, perfectly appropriate to the facts of the cases then before us. But to quote those statements in a case involving true "fighting words" is to quote them out of context. The reason is that true "fighting words" have no tendency to defame, but have only a tendency to anger.

As both the plurality opinion and the concurring opinion say, no one would ever believe the foul epithets used by the defendants in this case to be literally true. Regardless of the defendants' intention, they convey no assertion of fact which a hearer would consider capable of proof or disproof. Thus, these words could not form a basis for an action for libel or slander. They are simply verbal assaults. Hence, to hold that a statutory action for such words is "assimilated" to an action for libel or slander is to ignore the historic distinction between the two purposes served by the statute[8] and to deprive the victim injured by such verbal assaults of any remedy at all.

192 S.E.2d 766 (1972) (statement that plaintiff's checks would not be honored because her husband had disavowed her debts); and *Tweedy* v. *J. C. Penney Co.*, 216 Va. 596, 221 S.E.2d 152 (1976) (plaintiff accused of attempted theft).

[8] The insulting words statute was first enacted in 1810 as a part of a comprehensive scheme to deter duelling. In 1849 it was amended to permit the defendant to interpose such defenses as privilege and truth. We observed in *Chaffin* v. *Lynch*, 83 Va. 106, 121, 1 S.E. 803, 812 (1887), that the legislature had evidently concluded that the statute was a failure as a deterrent to duels. When the same case came before us again in 1888, 84 Va. 884, 888, 6 S.E. 474, 476, we specifically held that the statute "applies to both classes of actions alike," *i.e.* (1) actions for insults tending to a breach of the peace, and (2) actions for libel and slander. The reason for leaving it on the books, despite its failure as an anti-duelling measure, was that the first class of cases had not been actionable at common law, and the second class was made actionable by the statute without the common-law requirement of publication. It is clear that in our cases prior to 1928, the distinction between the two classes was clearly recognized. In *Hines* v. *Gravins*, 136 Va. 313, 320, 112 S.E.2d 869, 871 (1923) (citations omitted), we said:

> When the history of the statute is recalled, and it is observed that its purpose was so to extend the common law as to give a right of action for insulting words, even

If there is an unfortunate lack of remedy for such words in Virginia, as the plurality opinion implies and the concurring opinion flatly states, the fault cannot be laid at the door of the General Assembly. That body has amended the statute several times since 1928. It expressly reenacted it as a part of the Code of 1950 (former § 8-630) and again reenacted it in the 1977 recodification which resulted in the adoption of Title 8.01. Each time, the legislature specified that the words made actionable are those which "tend to violence and breach of the peace." If the statute is as hamstrung as the concurring opinion says, it is the interpretation expressed in that opinion which makes it so.

Although the remedy which the statute provides for defamatory words has been assimilated to an action for libel or slander, its remedy for true "fighting words" remains. The General Assembly has said so repeatedly, and we have never said otherwise. The effect of our insulting words statute, therefore, has been narrowed in precisely the same way as New Hampshire's was in *Chaplinsky*.

I would hold that Code § 8.01-45 affords an independent cause of action to redress true "fighting words" which tend to provoke violence and breach of the peace, as distinguished from words merely defamatory, and that such actions are not assimilated to actions for libel or slander. I would further hold, because of the State's legitimate interest in preserving internal peace and public order, that the remedy is not preempted by federal law. Because the plaintiff proved a case which clearly meets the foregoing requirements, I would affirm.

CARRICO, C.J., and STEPHENSON, J., join in dissent.

---

though containing no imputation which was actionable at common law, the reason for the rule . . . seems to us apparent. The design of the statute is to prevent breaches of the peace . . . .

In *Wright* v. *Cofield*, 146 Va. 637, 640, 131 S.E. 787, 788 (1926), our last true "fighting words" case, we said that the purpose of the statue was "[t]o prevent the use of language by one toward another likely to bring about a personal encounter."

The only other States having similar statutes appear to be West Virginia and Mississippi. In both, the distinction between "fighting words" and defamatory words is clearly recognized, and the respective statutes are made applicable to "fighting words" for the purpose of discouraging breaches of the peace, *Mauck* v. *City of Martinsburg*, 280 S.E.2d 216 (W. Va. 1981); Malone, *Insult in Retaliation—The Huckabee Case*, 11 Miss. L.J. 333 (1939). Neither state holds that the statutory action, in cases involving "fighting words," has been assimilated to an action for defamation.