# CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Michael C. Jarrett

v.

Lon Goldman,
Robert Webb,
Bridgette Ward,
and Viacom International, Inc.

May 31, 2005

Case No. (Law) 04-779

BY JUDGE MARK S. DAVIS

This matter is before the Court, pursuant to Va. Code § 8.01-273, on the demurrer of defendants Lon Goldman and Robert Webb, as well as the demurrer of defendants Viacom International, Inc. ("Viacom") and Bridgette Ward. The factual and procedural background of the case, discussion of the issues, and conclusions are set forth below.[1]

---

[1] The plaintiff, Michael C. Jarrett, was represented at the hearing by Thomas F. Hennessy, Esquire, though he is now represented by Tina McCree Orr, Esquire, with the Esquire Entertainment Group, Inc. Defendants Goldman and Webb are represented by Warren David Harless, Esquire, with the firm of Christian & Barton,

## I. Factual and Procedural Background

Plaintiff, Michael C. Jarrett, filed his Motion for Judgment against the defendants on April 13, 2004. This Court sustained demurrers of each defendant at the conclusion of the October 18, 2004, demurrer hearing, and such rulings are reflected in the Order entered by the Court on December 2, 2004. The Court also granted leave for Jarrett to file an Amended Motion for Judgment, which he did on December 28, 2004.

Plaintiff Jarrett alleged in his Amended Motion for Judgment that, in 2003, he was employed by defendant Viacom at UPN 27/WGNT-TV in Portsmouth, Virginia, under the direct supervision of defendants Goldman, Webb, and Ward. Jarrett contends that "[i]n or around May 2003, Defendant Goldman, while face-to-face with Plaintiff Jarrett in Goldman's office, screamed 'you are a stupid motherfucker' to Plaintiff Jarrett" and that such "outburst took place in the vicinity of other employees and was overheard by other employees." Jarrett also alleges that Goldman was acting within the course and scope of his work at the time of this incident and that Goldman was terminated by Viacom as a result of this incident. Amended Motion for Judgment ("AMJ"), ¶ 7. Plaintiff Jarrett further alleged that "[o]n that same day, Defendant Webb, while face-to-face with Plaintiff Jarrett, screamed 'you are a fucking idiot' to Plaintiff Jarrett" and that such "outburst took place in the vicinity of other employees and was overheard by other employees." Jarrett also alleges that Webb was acting within the course and scope of his work at the time of this incident and that Webb was terminated by Viacom as a result of this incident. AMJ, ¶ 8.

Pursuant to the complaint process contained in Viacom's Business Conduct Statement, which had been distributed to Jarrett by Viacom, Jarrett alleges he filed a complaint with the Viacom Compliance Officer, asserting "that his managers unlawfully discriminated against him in favor of young females by providing these females with account lists that were not provided to him and that they harassed and cursed at him" in violation of the Viacom Business Conduct Statement. AMJ, ¶ 10. Jarrett goes on to assert that, in August 2003, after Goldman's termination by Viacom, Goldman "told James Parker, a principal in an advertising agency called Omega Advertising, 'James you ought to get another account representative because Mike [Jarrett] will

L.L.P. Defendants Ward and Viacom are represented by James P. Naughton, Esquire, with the firm of Hunton & Williams, L.L.P.

screw up your accounts because he has screwed up many other accounts'."
AMJ, ¶ 11.

Jarrett claims that Viacom terminated him on December 4, 2003, in retaliation for his complaint to the Viacom Compliance Officer. AMJ, ¶ 12. Jarrett also alleges that, after his December 4, 2003, termination, "Ward told Namon Jones that one reason why Plaintiff Jarrett's employment with Defendant Viacom was terminated was that 'he [Jarrett] sent the wrong information to First Team Auto's agency, Engelhardt and Partners. . . .'" AMJ, ¶ 13.[2] Jarrett claims this statement was false and was also made to Stan Jones. Similarly, Jarrett asserts that Viacom's Sales Manager, Richard Harris, within the course and scope of his employment, "told Stan Jones that Jarrett 'was incompetent and didn't know what he was doing'," and that "Jarrett was fired 'for not making his budget.'. . ." AMJ, ¶ 14.

Plaintiff Jarrett first asserts a cause of action in tort under the Virginia insulting words statute. Jarrett claims that the statements of Goldman and Webb, referenced above from ¶¶ 7 and 8 ("you are a stupid motherfucker" and "you are a fucking idiot"), "from their usual construction and common acceptance, are insulting and tending to provoke violence and breach of the peace" in violation of Va. Code § 8.01-45 (Virginia insulting words statute) and were uttered "with actual malice and the intent to inflict physiological injury on Plaintiff Jarrett." AMJ, ¶¶ 16-17, 19-20. Such words, according to Jarrett, caused "injury consisting of pain, suffering, and mental anguish," resulting in "physical injury, including high blood pressure and depression." AMJ, ¶¶ 18, 21. The heading of the insulting words allegations reflects that Jarrett asserts this cause of action against Goldman, Webb, and Viacom.

Jarrett next asserts a cause of action for breach of implied contract. Specifically, Jarrett asserts that "Viacom's Business Conduct statement constitutes an implied contract," and that "Viacom breached this contract by terminating Plaintiff Jarrett in retaliation for his complaint concerning violation of Defendant Viacom's harassment-free workplace policy." AMJ, ¶¶ 23-24.

Finally, Jarrett asserts a cause of action in tort for defamation against Goldman, Ward, and Viacom, claiming that while acting in the course and scope of their employment for Viacom, Goldman and Ward "did, with actual

---

[2] Jarrett did not contest Viacom and Ward's assertion at the demurrer hearing, that Namon Jones and Stan Jones were Viacom employees at all relevant times. *Solomon v. Atlantic Coast Line RR.*, 187 Va. 240, 247, 46 S.E.2d 369, 372 (1948) (uncontradicted statement of counsel accepted as true by Court on subject made).

malice, publish the false and defamatory statements" as referenced above from ¶¶ 11 and 13 regarding his work performance and termination. AMJ, ¶ 27. Jarrett alleges that these statements were made "with actual malice, that is with knowledge that the statements were false or with reckless disregard of whether or not they were false," and they were designed by Goldman and Ward to discredit Jarrett in his profession and, as such, were malicious and per-se defamatory. AMJ, ¶ 28. Jarrett claims injury to his reputation and financial loss. AMJ, ¶ 29. Jarrett requests judgment against defendants, jointly and severally, for $600,000 in compensatory damages and $350,000 in punitive damages.

During the October 18, 2004, hearing, the Court granted Viacom's Motion Craving Oyer of Jarrett's signed employment application and his signed Acknowledgment of receipt of Viacom's June 2002 Human Resources Policy Manual. The employment application provides that "my employment may be terminated at any time, with or without notice, at the will of either myself or Paramount," and that "my employment at-will status cannot be changed by any employee or representative of Paramount except in writing signed by me and the senior human resources executive of Paramount." The Acknowledgment provides that "[t]he Policy Manual does not constitute a contract and there is no change in the at-will status of employees." It goes on to provide that "[a]ny written agreement (contract) between an employee and Viacom Television Stations that alters these policies must be signed by the appropriate senior management and approved by the Senior Vice President, Human Resources," and such "agreement can only be signed by the President, Viacom Television Stations Groups."

## II. Discussion

### A. Contentions of the Parties

#### 1. Viacom and Ward

Viacom contends that Jarrett's insulting words claim, based upon the alleged statements of employees Goldman and Webb, fails because the allegedly insulting words are not provably false and defamatory. Viacom further alleges that the insulting words statute, Va. Code § 8.01-45, is unconstitutionally vague and/or overbroad. Alternately, Viacom alleges that Jarrett's allegations "fail to create the inference that the allegedly insulting words tended to provoke violence and an immediate breach of the peace."

Viacom next argues that it is not vicariously liable for the actions of any individual defendant because Jarrett alleges such employees acted with actual malice, thereby removing such actions from the course and scope of the employment. Viacom also contends that Jarrett's allegation that the offending employees were terminated undercuts any suggestion they were acting in the course and scope of their employment.

Viacom also claims that Jarrett's implied contract claim fails because he signed a statement acknowledging that he had no employment contract, express or implied. Furthermore, Viacom argues that their printed anti-harassment and anti-retaliation policies are simply statements of existing federal employment laws and, as such, no consideration exists to support formation of a contract between Viacom and Jarrett based on such provisions. Viacom also suggests that Jarrett's implied contract claim is a "disguised attempt to plead around the General Assembly's '*Lockhart*' amendments to the Virginia Human Rights Act which bar wrongful discharge claims implicating the public policies reflected in the Act."

Viacom and Ward further allege that the statements attributed to Ward and Harris were privileged because they were intracorporate communications on employment matters and the absence of malice is therefore presumed. As to Harris, Viacom and Ward assert that Jarrett fails to allege Harris acted with actual malice. As to Ward, it is asserted that merely alleging "actual malice," without stating actual facts is insufficient as a matter of law to defeat a defense of privilege. Both Viacom and Ward assert that the statements attributed to Ward and Harris were statements of opinion that are not actionable because they are not provably false.

## 2. Goldman and Webb

Goldman and Webb argue that Virginia's insulting words statute is unconstitutionally vague and/or overbroad because the statute does not define the term "insulting" and it does not require that such insults be communicated under any particular circumstances-meaning it could easily extend to a wide variety of workplace criticism. Goldman and Webb go on to assert that, even if the statute is not facially invalid, the alleged insulting words are not provably false and defamatory, as required by Virginia Supreme Court precedent indicating that the insulting words statute is completely subsumed into the common law of defamation, therefore requiring a provably false statement. Furthermore, they assert that the words alleged did not present a clear and present danger of a violent physical conflict. Goldman also asserts that the alleged statement indicating Jarrett "screwed up" and would "screw up" is

merely a proclamation of opinion which cannot be proven false and is therefore not defamatory.

### B. Demurrer Standard

In filing demurrers, the defendants challenge the legal sufficiency of the amended motion for judgment and demand the judgment of the court on the matter before proceeding further. The demurrer standard is succinctly reflected in Va. Code § 8.01-273(A), providing that "the contention that a pleading does not state a cause of action or that such pleading fails to state facts upon which relief can be granted may be made by demurrer." Applying this standard, the Virginia Supreme Court has said: "[v]iewing the allegations of the amended motion for judgment, as we must on demurrer, and accepting as true all material facts which are well-pleaded but not necessarily approving the conclusions of law stated by the pleader, *Ames v. American National Bank*, 163 Va. 1, 37-38, 176 S.E. 204, 215-16 (1934), the sole issue is whether the plaintiff has set forth a cause of action against the defendants." *Votsis v. Ward's Coffee Shop*, 217 Va. 652, 654, 231 S.E.2d 236, 238 (1977). Furthermore, "[o]n demurrer, a court may examine not only the substantive allegations of the pleading attached but also any accompanying exhibit mentioned in the pleading." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24, 431 S.E.2d 277, 278 (1993); *see Ward's Equip. v. New Holland N. Am.*, 254 Va. 379, 382, 493 S.E.2d 516, 518 (1997) (in ruling on demurrer, the court may consider any written agreement added to the record on motion craving oyer). Finally, the Court notes that, because the First Amendment to the Constitution of the Untied States, and article 1, section 12, of the Constitution of the Commonwealth of Virginia protect the right of the people to "speak any [pure expression of opinion, not amounting to 'fighting words'], however ill-founded, without inhibition by actions for libel and slander," *American Communications Network, Inc. v. Williams*, 264 Va. 336, 340, 568 S.E.2d 683, 685 (2002), the Court carefully reviews any allegation and cause of action that tends to inhibit speech.

Plaintiff Jarrett alleges three causes of action: (1) violation of the Virginia insulting words statute by Goldman, Webb, and Viacom; (2) defamation by Goldman, Ward, and Viacom, and (3) breach of implied contract by Viacom. Because the arguments of the parties as to both the insulting words cause of action and the defamation cause of action require the Court to address the law applicable to defamation, the Court will first review the law of defamation in Virginia. The Court will then more specifically

address the law applicable to the insulting words cause of action and the breach of implied contract cause of action.

## C. Defamation

The law of defamation in Virginia has historically protected an individual's basic right to the uninterrupted enjoyment of his reputation. *Gazette, Inc. v. Harris*, 229 Va. 1, 7, 325 S.E.2d 713, 720 (1985); *Virginia Model Jury Instructions, Civil*, 1998 Replacement Edition with 2004 Supplement, Scope, II-150. While the free speech protections of the United States Constitution do not specifically recognize the dangers of defamation,[3] the Virginia Constitution explicitly recognizes a speakers' responsibility to refrain from "abuse of" the right of free speech to defame another through speech. Va. Const., Art. I, § 12.[4] As recognized by the Virginia Constitution, the contrasting principles of an individual's right to free speech and the right to restrain the speech of others for the enjoyment of one's own reputation form the basis of modern defamation law. *See Virginia Model Jury Instructions, Civil*, Scope, II-150. Because of the importance that society ascribes to a good name, the common law tort of defamation is "designed to effectuate society's 'pervasive and strong interest in preventing and redressing attacks upon reputation.'. . ." *Freedlander v. Edens Broadcasting, Inc.*, 734 F. Supp. 221, 224 (E.D. Va. 1990). As Judge Williams noted in *Freedlander*,

---

[3] While not specifically recognizing the danger of defamation, the First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const., amend. I.

[4] The Virginia Constitution provides that "[t]he freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may speak freely, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances." Va. Const., Art. I, § 12. The protections, regarding free speech, that are afforded under the Virginia Constitution are co-extensive with those in the U.S. Constitution. *See Bennefield v. Commonwealth*, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996).

"[u]ndoubtedly, defamation actions cannot fully rehabilitate individual dignity; nevertheless, it is well-understood that 'the jingl[e] of the guinea helps the hurt that Honor feels.'. . ." *Id.* (*citing* Alfred, Lord Tennyson, *Locksley Hall*, 1.105 (1842)).

Prior to 1964, the Virginia case law addressing defamation was largely unconcerned with constitutional free speech concerns, primarily focusing on common law tort concepts. However, recognizing the free speech implications of permitting defamation suits in certain situations, "[t]he power of State courts to permit awards of damages in defamation cases has been substantially limited by the Supreme Court of the United States during the past decades," beginning with the "landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). . . ." *Newspaper Publishing Corp. v. Burke*, 216 Va. 800, 802, 224 S.E.2d 132, 134 (1976). Therefore, in addition to applying the pre-1964 tort-based principles of the common law involving defamation, courts must now consider constitutional free speech and due process concerns when evaluating such claims. As Judge Williams also noted, "[w]here plaintiffs, such as [Jarrett], seek to avail themselves of this pecuniary salve, courts must balance the state's interest in compensating private individuals for injury to their reputation against the first amendment interest in protecting public speech." *Freedlander*, 734 F. Supp. at 224. Such "analysis requires that the Court initially determine whether the controversial publication is indeed defamatory and if so, whether it is 'of a character which the principles of the First Amendment . . . protect.'. . ." *Id.* (*quoting New York Times v. Sullivan*, 376 U.S. 254, 285, 84 S. Ct. 710, 728-29, 11 L. Ed. 2d 686, 709 (1964)).

In making the initial determination whether speech is defamatory, the Court must look to the definition of defamation. Defamation has been described as "[h]olding up of a person to ridicule, scorn or contempt in a respectable and considerable part of the community. . . ." *Black's Law Dictionary*, Fifth Edition, 1979. The Restatement of Torts, Second, at §§ 559, 563, describes defamation as follows: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Important distinctions were made at common law and continued into early Virginia practice between words which were defamatory *per se* and those which were defamatory only if special damage could be shown to have resulted from their publication (also referred to as *per quod*). Since all defamation in Virginia is either *per se* (by itself) or *per quod* (whereby), it is important to understand the difference. The Virginia Supreme Court has described the difference between the two types of defamation as follows:

The common law rule divides false, defamatory words which will sustain an action in five classes: 1. Words falsely spoken of a person which impute to the party the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. 2. Words falsely spoken of a person which impute that the party is infected with some contagious disease, where, if the charge is true, it would exclude the party from society. 3. Defamatory words falsely spoken of a person which impute to the party unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. 4. Defamatory words falsely spoken of a party which prejudice such party in his or her profession or trade. 5. Defamatory words falsely spoken which though not in themselves actionable, occasion the party special damage. The first four of these classes are slanderous *per se*, the other only when special damage results.

*M. Rosenberg & Sons v. Craft*, 182 Va. 512, 518, 29 S.E.2d 375, 378 (1944) (*cited in Virginia Model Jury Instructions, Civil, Scope*, II-151).

The common law tort of defamation requires proof of the following elements: (1) publication (2) of a false (3) defamatory statement (4) concerning the plaintiff. *Gazette, Inc.*, 229 Va. at 37, 325 S.E.2d at 738. Prior to the 1964 decision in *New York Times*, a "defamed private citizen had to prove only a false publication that included words which were either actionable *per se* according to certain fixed principles, or, if not defamatory *per se*, words which resulted in special damages to the party defamed." *Id.* at 8, 325 S.E.2d at 720. With the advent of the decision in *New York Times*, different standards are applied in analyzing claims by different types of plaintiffs. Accordingly, the Court must pay special attention to the relationship between the plaintiff and the defendant. Where, as here, the plaintiff is a private individual (rather than a public official or public figure), the standard for recovery is negligence/reasonableness, *The Gazette*, 229 Va. at 15, 325 S.E.2d at 724-5; *see also Fleming v. Moore*, 221 Va. 884, 891-92, 275 S.E.2d 632, 637 (1981) (declining to impose standard on private individuals more stringent than simple negligence), *unless* a private individual seeks damages for a statement that does not make substantial danger to reputation apparent, in which case the plaintiff must show "*New York Times*" malice.[5] In Virginia,

---

[5] There are other constitutional considerations that apply to plaintiff's punitive damages claim, such as the need for proof of *New York Times* malice. *Gertz v. Robert*

such a private individual must prove all the required elements of the tort in order to recover. *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 149-50, 334 S.E.2d 846, 851-53 (1985).[6]

As noted above, at common law, spoken words falling into several categories are actionable as defamatory per se when falsely spoken. Such words include words that impute to a person an unfitness to perform the duties of an office or employment of profit or want of integrity in the discharge of the duties of such office or employment. *See Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 146-47, 334 S.E.2d 846, 849 (1985); *see also Freedlander*, 734 F. Supp. 221. All other defamatory words, though not in themselves actionable, may become actionable if they occasion special damages to a person. *Id.* However, even if a statement is proven false, spoken words that are merely interpretative, or insulting, or imputing only disorderly or immoral conduct, or ignoble habits, propensities, or inclinations or a want of refinement, delicacy, or good breeding are not regarded by the common law

---

*Welch, Inc.*, 418 U.S. 323, 348-49, 94 S. Ct. 2997, 3011, 41 L. Ed. 2d 789, 810 (1974). However, it is for the states to define for themselves the appropriate standard of liability for a publisher of defamatory falsehoods injurious to a private individual. *Gazette, Inc. v. Harris*, 229 Va. 1, 10-11, 325 S.E.2d 713, 722 (1985). Because this Court need not reach the issue of plaintiff's request for punitive damages, and because the Court considers plaintiff's claims under the standard of liability defined by Virginia, it is not necessary to conduct the strict scrutiny analysis applicable to content-based restrictions on speech. *See Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794, 804 (1983).

[6] In *Gazette v. Harris*, 229 Va. 1, 15, 325 S.E.2d 713, 724-25 (1985), the Court held that where a private individual sues another private individual alleging defamation and seeking compensatory damages, such plaintiff may recover upon proof by a preponderance of the evidence that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based. Under this standard, truth no longer is an affirmative defense to be established by the defendant. Instead, the plaintiff must prove falsity, because he is required to establish negligence with respect to such falsity. However, the application of this standard is expressly limited to circumstances where the defamatory statement makes substantial danger to reputation apparent. If no substantial danger is apparent from the statement, *New York Times* malice must be established to recover compensatory damages.

as sufficiently substantial injuries to call for redress in damages. 1 Michie's Jurisprudence, *Libel and Slander*, § 3, *citing Moseley v. Moss*, 47 Va. (6 Gratt.) 534 (1850). An assertion of damage resulting from such statements is essentially frivolous, and damages may not be recovered based on such claims. *Motsinger v. Kelly*, 9 Va. Cir. 9 (Danville 1985).

In addition to these limitations on recovery for alleged defamation, pure expressions of opinion, not amounting to "fighting words," cannot form the basis of an action for defamation. *American Communs. Network, Inc.*, 264 Va. at 340, 568 S.E.2d at 685. This is because statements of opinion cannot be objectively characterized as true or false. *Jordan v. Kollman*, 269 Va. 569 (2005). Hence, statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion. *Id.* It is for the Court to determine as a matter of law whether an allegedly defamatory statement is one of fact or opinion. *Id.* Applying these principles, the Court now looks to the specific statements alleged here.

## 1. Goldman

Plaintiff alleges defamation against Goldman based on an assertion that in August 2003, after Goldman's termination by Viacom, Goldman "told James Parker, a principal in an advertising agency called Omega Advertising, 'James you ought to get another account representative because Mike [Jarrett] will screw up your accounts because he has screwed up many other accounts.'. . ." Goldman asserts that this was merely an expression of opinion that cannot be proven false and is not defamatory. *See WJLA-TV v. Levin*, 264 Va. 140, 156, 564 S.E.2d 383, 392 (2002).

The Virginia Supreme Court considered statements similar to that attributed to Goldman in *Fuste v. Riverside Healthcare Assoc., Inc.*, 265 Va. 127, 575 S.E.2d 858 (2003). In that case, two physicians alleged that their former employer defamed them by mailing various statements to patients and others. The Court noted that "pure expressions of opinion, not amounting to 'fighting words,' are protected by the First Amendment of the Constitution of the United States and Article 1, § 12, of the Constitution of Virginia." *Id.* at 132, 575 S.E.2d at 861. Therefore, "speech which does not contain a provably false factual connotation, or statements which cannot be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Id.* Furthermore, and particularly relevant to the facts of this case, the Court said that statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion. *Id.* Applying those principles, the Court held that the alleged statements that Drs. Fuste and

Vanden Hock "abandoned" their patients and that there were "concerns about their competence" not only prejudice the doctors in the practice of their profession, but also contain a provably false factual connotation. *Id.* at 133, 575 S.E.2d at 861-62. The Court said that the remaining alleged statements are either dependent on the speaker's viewpoint and thus expressions of opinion that do not prejudice the doctors in their profession, or are not defamatory when taken in their plain meaning. *Id.* These other statements that did not form the basis of a defamation action included the following: that they were "unprofessional," "uncooperative," that they "left suddenly," they "were not able to work in the area," that "their whereabouts were unknown," and that they "left suddenly and that she should find another pediatrician."

While an opinion containing no provably false factual connotation may not alone form the basis of an action for defamation, factual statements made to support or justify an opinion can form the basis of an action for defamation. *WJLA-TV*, 264 Va. at 156, 564 S.E.2d at 392. Plaintiff asserts in his post-hearing brief that Goldman's derogatory statements about his work habits and productivity are factual statements amounting to actionable defamation, citing *Kay v. Collins*, 39 Va. Cir. 150, 151-52 (Richmond 1996). In essence, plaintiff is alleging that Goldman's statements constitute defamation *per se* since they allegedly prejudice the plaintiff in his profession or trade. *Fuste*, 265 Va. at 132, 575 S.E.2d at 861. In *Kay*, the Court found that a previous employer's statement, to a third party helping plaintiff find employment, that the plaintiff had been fired because of non-productivity, was a provably false defamatory statement. Goldman's alleged statement that Jarrett had "screwed up many other accounts" is the crux of Jarrett's complaint against Goldman. This statement is not like a statement that a person was "fired," or "abandoned" patients in a professional context, or that a former employer/community health-care provider had concerns about physicians' competence. The use of the words "screwed up" is more akin to an opinion, just like the statement that someone should not be hired. The Court in *Kay* did not find the statements recommending against hire to be actionable, only the factual support for such opinion, i.e. that the person was fired because of non-productivity. Similarly, the statements attributed to Goldman (that the plaintiff would "screw up" Parker's accounts and had "screwed up" other accounts) are best characterized as statements of opinion that are not actionable. *Corporate Training Unlimited v. NBC*, 868 F. Supp. 501, 511 (E.D. N.Y. 1994) (statement that organization "screwed up" family's life was not statement of verifiable fact and thus was non-actionable opinion); *see Hupp v. Sasser*, 200 W. Va. 791, 799, 490 S.E.2d 880, 888 (1997) (recognizing statement in *Sandler v. Marconi Circuit Technology Corp.*, 814 F. Supp. 263, 268 (E.D. N.Y. 1993), that plaintiff

"screwed up" company, as non-actionable statement of opinion). Therefore, since the alleged statement in this case is relative in nature and depends largely upon the speaker's viewpoint, plaintiff has failed to state facts that support a cause of action for defamation based upon Goldman's statement.

## 2. Ward

Plaintiff asserts that after his own December 4, 2003, termination, "Ward told Namon Jones that one reason why Plaintiff Jarrett's employment with Defendant Viacom was terminated was that 'he [Jarrett] sent the wrong information to First Team Auto's agency, Engelhardt and Partners.'. . ." Plaintiff also alleges that statement was made to Stan Jones. Again, in essence, plaintiff is alleging defamation *per se*. Plaintiff does not dispute that Namon Jones and Stan Jones were both Viacom employees at the time those statements were allegedly made, as was the speaker, Ward.[7] Ward asserts that these statements were privileged because they were intracorporate communications on employment matters and the absence of malice is therefore presumed. Applying the same principles outlined above, it might be said that Ward's statement is closer to being a provably false statement of fact, rather than opinion, than was Goldman's statement referenced above. This is because one can arguably prove whether Ward's statement, that Jarrett sent the wrong information, is true or false. But the Court need not reach that issue if the allegedly defamatory statement is privileged.

In Virginia, a "communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral, or social, is qualifiedly privileged if made to a person having a corresponding interest or duty." *Taylor v. Grace*, 166 Va. 138, 144, 184 S.E. 211, 213 (1936). In carrying out its duty to determine as a matter of law whether a communication is privileged, our federal and state courts have held that communications made in the context of an employment relationship are covered by this qualified privilege. *Shabazz v. PYA Monarch*, 271 F. Supp. 2d 797, 806-07 (E.D. Va. 2003) (noting that in *Kroger Co. v. Young*, 210 Va. 564, 566, 172 S.E.2d 720, 722 (1970), court found statements made "by an

---

[7] Plaintiff did not dispute, at oral argument or thereafter in his post-hearing brief, Ward's assertion that Namon Jones and Stan Jones were both account executives, when the statement was made, at Viacom's local station, WGNT, as plaintiff had been. Plaintiff has never asserted that these other employees had no duty or interest in the subject matter. *Larimore v. Blaylock*, 259 Va. 568, 575, 528 S.E.2d 119, 122 (2000).

employer to his employees of reason for the discharge of a fellow employee . . . are qualifiedly privileged"). Such a qualified privilege may be defeated by clear and convincing evidence that the defamatory words were spoken with common-law malice.[8] *Smalls v. Wright*, 241 Va. 52, 55, 399 S.E.2d 805, 808 (1991).

The Virginia Supreme Court recently applied the qualified privilege in *Fuste*. In *Fuste*, the health care defendants argued that any statements allegedly made by them during their own credentialing process or to the credentialing officials at other hospitals were privileged and therefore not actionable. *Fuste*, 265 Va. at 134-35, 575 S.E.2d at 862-63. The Court recognized that "while we have applied the doctrine of qualified privilege in cases involving alleged defamatory statements made 'between persons on a subject in which the persons have an interest or duty,' we have also held that this qualified privilege may be defeated by proof that the defamatory statements were made maliciously." *Id*. The *Fuste* Court went on to recognize that "[m]alice sufficient to overcome a qualified privilege is behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made," so-called common-law malice. *Id*. The Court further stated that it "is a court's duty to decide as a matter of law whether a communication is privileged," but "the question whether a defendant 'was actuated by malice, and has abused the occasion and exceeded [the] privilege' is a question of fact for a jury." *Id*.

In the present case, Ward's statement to a fellow employee regarding the reason for Jarrett's termination appears, on its face, to be qualifiedly privileged since it was a statement by one of plaintiff's purported supervisors providing a reason for the discharge of a fellow employee. However, the Court must still determine whether Jarrett's allegations of malice are sufficient as a matter of law to defeat the assertion of privilege.

In *Echtenkamp v. Loudoun County Public Schools*, 263 F. Supp. 2d 1043, 1062 (E.D. Va. 2003), the federal district court, applying Virginia law,

---

[8] "Actual malice," sometimes referred to as *New York Times* malice, *New York Times*, 376 U.S. at 280, 84 S. Ct. at 726, 11 L. Ed. 2d at 706-07, focuses only upon knowledge of falsity or reckless indifference to falsity. *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 149, n. 3, 334 S.E.2d 846, 851, n. 3 (1985). Common-law malice (a broader concept than *New York Times* malice) includes that element (knowledge of falsity or reckless indifference), but also includes matters related to the speaker's motive and mental state, such as hatred, revenge, personal spite, ill will, or a desire to injure another. *Id*.

considered this question of how much must be pleaded to defeat an assertion of privilege. The Court said:

> In other words, to avoid the qualified privilege, plaintiff must show [by clear and convincing evidence] that "the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." [*Southeastern Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 276, 435 S.E.2d 131, 132-33 (1933)]. Thus, in order to state a claim for defamation, plaintiff must allege facts sufficient ultimately to support a finding by clear and convincing evidence that the statements of her supervisors and co-workers were made with actual, common-law malice. *Id.* at 275-76, [435 S.E.2d 131, 132]. . . .

> [P]laintiff's repeated assertions that each defendant charged with defamation acted "with malice" and with a "motive of personal spite and revenge" are not, by themselves, sufficient to state a claim of malice sufficient to overcome the qualified privilege. . . . Such conclusory allegations do not state a claim for malice if the facts as alleged cannot otherwise support a finding of malice. *See Young v. City of Mount Rainier*, 238 F. 3d 567, 577 (4th Cir. 2001) (holding that plaintiff does not state a claim requiring "deliberate indifference" merely by "throw[ing] in words and phrases such as 'deliberate indifference,' 'malicious,' 'outrageous,' and 'wanton' when describing the conduct").[9]

In this case, Jarrett alleges that Ward made the statement with common-law malice and that it was designed to discredit Jarrett. However, other than saying that the statement was designed to discredit Jarrett, plaintiff Jarrett provided no other factual allegations in support of his assertion that the statement was made with common-law malice. For example, Jarrett never alleged facts showing that the statement was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff. The absence of such factual allegations prevents plaintiff

---

[9] *See Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, *cert. denied*, 472 U.S. 1032, 105 S. Ct. 3513, 87 L. Ed. 2d 643, 473 U.S. 905, 105 S. Ct. 3528, 87 L. Ed 2d 653 (1985), 479 U.S. 890, 107 S. Ct. 291 (1986).

from stating a claim for defamation that could ultimately support a finding by clear and convincing evidence (or even a preponderance of the evidence) that the alleged statement was made with actual common-law malice. Therefore, plaintiff has failed to state sufficient facts to support a cause of action for defamation based upon Ward's statement.

### 3. Viacom

Having concluded that Jarrett's allegations against Goldman and Ward do not state claims for defamation, it is unnecessary to consider derivative liability of Viacom for such statements. However, plaintiff does assert that Viacom is liable for defamatory statements allegedly made by its employee, Richard Harris, even though Harris is not individually named as a defendant. Jarrett alleges that Harris, Viacom's Sales Manager at the time of the allegations, acting within the course and scope of his employment, told Stan Jones (another Viacom employee) that Jarrett was incompetent and did not know what he was doing, and that he was fired for not making his budget. For the same reasons stated above as to Goldman, the statements attributed to Harris, regarding Jarrett's being incompetent and not knowing what he was doing, is not speech which contains a provably false factual connotation and, therefore, cannot be interpreted as stating actual *facts* about Jarrett that can form the basis of a common law defamation action. *Newman v. Hansen & Hempel Co.*, 2002 U.S. Dist. LEXIS 21233, *26, 19 I.E.R. Cas. (BNA) 781 (N.D. Ill. 2002) (statement that plaintiff was "incompetent" at her job was non-actionable opinion); *Brattis v. Rainbow Advertising Holdings, L.L.C.*, 2000 U.S. Dist. LEXIS 7345, *12-13, 141 Lab. Cas. (CCH) P59,013 (S.D. N.Y. 2000) (noting statements of incompetence are non-actionable opinion). However, the statement that Jarrett was fired for not making his budget can be objectively tested and proven to be true or false. *See Lamb v. Weiss*, 62 Va. Cir. 259, 267-68 (Winchester 2003) (holding that plaintiff's allegation that defendant said he had "not properly managed his advertising budget" and "misspent the [advertising] funds" was objectively testable and withstood demurrer, citing *Perk v. Vector Resources*, 253 Va. 310, 316, 485 S.E.2d. 140, 144 (1997)). The *Lamb* court reviewed numerous cases to determine whether specific statements constituted defamation and concluded that the "consistent thread through all of the cases where the statements were held sufficient to support a defamation action is a statement of specific facts such as law violations or specific poor work habits." *Lamb*, 62 Va. Cir. at 267.

While the alleged Harris statement that Jarrett was fired for not making budget can be objectively tested and is therefore capable of being defamatory,

the question remains whether the statement is privileged. As noted above, the Virginia Supreme Court has recognized the doctrine of qualified privilege in cases involving alleged defamatory statements made between persons on a subject in which the persons have an interest or duty. *Fuste*, 265 Va. at 134-35. The fact that Jarrett alleges Viacom's Sales Manager, Harris, was acting in the course and scope of his employment at the time the statement was made undercuts any suggestion that Harris had no legitimate interest in the statement he made and that the privilege fails to apply. Likewise, Harris was allegedly speaking to Stan Jones, a fellow Viacom employee, regarding the reason for Jarrett's termination. As noted above in the discussion of Ward's statement to Namon Jones, such a statement appears to be qualifiedly privileged on its face since it was a statement by one of plaintiff's purported supervisors providing a reason for the discharge of a fellow employee. Nor is there any suggestion that this qualified privilege is defeated by proof that the statement was made maliciously. As noted above in the discussion involving Ward, there must be allegations of common-law malice sufficient as a matter of law to defeat the assertion of privilege. *Echtenkamp*, 263 F. Supp. 2d at 1062. Such allegations are absent here, and Viacom's demurrer is therefore sustained.

As a result of these rulings, it is unnecessary to address defendants' additional arguments.

## D. Insulting Words

Plaintiff also asserts a cause of action in tort under the Virginia insulting words statute. Virginia Code § 8.01-45 creates a statutory civil action for insulting words. The statute provides that: "All words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." Although the predecessor statute was originally adopted to discourage dueling, the statute still exists. *W. T. Grant Co. v. Owens*, 149 Va. 906, 914, 141 S.E. 860, 863 (1928). The current statute's modern purpose is to avoid verbal confrontations that may lead to violence or other breaches of the peace. *See Hines v. Gravins*, 136 Va. 313, 320, 112 S.E. 869, 871 (1922), *cert. denied*, 265 U.S. 583, 44 S. Ct. 458, 68 L. Ed. 1191 (1924). Since the amendment of the original statute in 1849, an action for insulting words has been treated entirely as an action for libel or slander, with the exception that no publication of the words is necessary.

While the U.S. Supreme Court explicitly permitted regulation of "fighting words," speech that is directed at another and likely to provoke a violent response, on the grounds that regulation of such speech has never been

thought to raise any constitutional problem, *see Chaplinsky*, 315 U.S. 568, 572, 62 S. Ct. 766, 769, 86 L. Ed. 2d 1031, 1035 (1942), more recently the Court in *R.A.V.* scaled back this doctrine by saying that language such as fighting words is not entirely invisible to the First Amendment. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-84, 112 S. Ct. 2538, 2543, 120 L. Ed. 2d 305, 317 (1992).[10]

The statutory tort under the insulting words statute has always been implemented as an action for defamation, but there are two exceptions to the normal defamation requirements: no proof of publication is necessary, and the words used must be provocative. Costello, *Virginia Criminal Law and Procedure*, Third Edition, § 17-14(e). As Professor Costello notes, while it would seem from the plain language of the statute that Virginia's fighting words statute (the statute for "insulting words") had to require words which tended to provoke violence, the assimilation of the insulting words action to

---

[10] Professor Chemerinsky noted in his text *Constitutional Law Principles and Policies, 2nd ed. 2002*, p. 968: "The Supreme Court never has overturned *Chaplinsky*; fighting words remain a category of speech unprotected by the First Amendment. But in the more than half century since *Chaplinsky,* the Court has never again upheld a fighting words conviction. Every time the Court has reviewed a case involving fighting words, the Court has reversed the conviction, but without overruling *Chaplinsky*. . . . The Court has used three techniques in overturning these convictions. First, the Court has narrowed the scope of the fighting words doctrine by ruling that it applies only to speech directed at another person that is likely to produce a violent response. Second, the Court frequently has found laws prohibiting fighting words to be unconstitutionally vague or overbroad. Third, the Court has found laws that prohibit some fighting words, such as expression of hate based on race or gender, to be impermissible content-based restrictions of speech. . . . The cumulative impact of these decisions is to make it unlikely that a fighting words law could survive. If the law is narrow, then it likely would be deemed an impermissible content-based restriction because it outlaws some fighting words, but not others, based on the content of the speech. If the law is broad, then it probably would be invalidated on vagueness or overbreadth grounds. . . ." Professor Chemerinsky concluded that these cases: *Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972); *Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S. Ct. 2479, 33 L. Ed. 2d 321 (1972); *Lewis v. City of New Orleans*, 408 U.S. 913, 92 S. Ct. 2499, 33 L. Ed. 2d 321 (1972); *Brown v. Oklahoma*, 408 U.S. 914, 92 S. Ct. 2507, 33 L. Ed. 2d 326 (1972); *City of Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987), indicate that a fighting words law will be upheld only if it is narrowly tailored to apply just to speech that is not protected by the First Amendment. Otherwise, the statute or ordinance will be deemed void on vagueness grounds or invalidated as being impermissibly overbroad.

defamation was "suppressive of that first thought." Costello, *supra*, § 17-14(e). The fact that publication is not necessary to sustain a cause of action for insulting words can be gleaned from several cases. For example, in *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 6, 82 S.E.2d 588, 591 (1954), the Virginia Supreme Court said that "[a]n action for insulting words under [the predecessor statute] is treated precisely as an action for slander or libel . . . with one exception, namely, no publication [to a third party] is necessary. The trial of an action for insulting words is completely assimilated to the common law action for libel or slander, and from the standpoint of the Virginia law it is an action for libel or slander." *However*, lest there be any question that provocation be necessary to prevail on an insulting words cause of action, in *Allen & Rocks, Inc. v. Dowell*, 252 Va. 439, 441-43, 477 S.E.2d 741, 742-43 (1996), the Virginia Supreme Court said that "[g]iven the plain language of Va. Code § 8.01-45, we hold that the plaintiff was required to prove, and failed to prove, that the words Rocks used in the telephone conversation were such as tended to violence or breach of the peace."

In that case, plaintiff Dowell was discharged without explanation by Ralph Rocks. After Dowell unsuccessfully sought employment for several months, he contracted with a company to ascertain the kind of reference his former employer was giving to his prospective new employers. In a telephone conversation, Rocks told the company that Dowell's accomplishments and interpersonal skills with management were unsatisfactory; that he did not communicate well with Rocks; that he had been discharged because of his performance; and that Rocks, were he in the shoes a potential employer, would not hire Dowell. Dowell then filed suit against his former employer alleging defamation and a claim under the Virginia insulting words statute. In holding that the plaintiff was required to prove that the words used by Rocks in the telephone conversation were such as tended to violence or breach of the peace, the Court said that "plaintiff cites no case in which we have said that any assimilation of the statutory cause of action for insulting words by the common law of defamation has eliminated the statutory necessity of showing that the words used were such as to provoke violence or breach of the peace. . . ." *Id.* Therefore, it is clear that in order to sustain a cause of action for insulting words, a plaintiff must meet all the requirements for a defamation cause of action except that proof of publication is not necessary and proof of provocation is necessary. *Contra Hutchins v. Cecil*, 44 Va. Cir. 380 (Fairfax 1998) (holding that the statute does not require proof of provably false statement).[11] With

---

[11] In *Hutchins v. Cecil*, 44 Va. Cir. 380, 383-84 (Fairfax 1998) the court concluded that the Virginia Supreme Court's decision in *Allen & Rocks, Inc. v. Dowell*, 252 Va.

these principles in mind, we now turn to the specific statements on which Jarrett bases his cause of action for insulting words.

## 1. Goldman

Jarrett alleges that, in May 2003, Goldman, while face-to-face with Jarrett in Goldman's office, screamed "you are a stupid motherfucker" to Jarrett in the vicinity of other employees and was heard by other employees. Goldman argues that Jarrett's insulting words claim fails because the allegedly insulting words are not provably false and defamatory, as required for a cause of action under Va. Code § 8.01-45.

In *Yeagle v. Collegiate Times*, 255 Va. 293, 295-96, 497 S.E.2d 136, 137 (1998), the Virginia Supreme Court noted that the United States Supreme Court has identified constitutional limits on the type of speech that may be the subject of common law defamation actions. The *Yeagle* Court stated that "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Id.* The

---

439, 477 S.E.2d 741 (1996), supports the proposition that Va. Code § 8.01-45 permits an independent cause of action to redress true "fighting words" *without* any requirement that such words be defamatory. This court is not convinced that the statement quoted from *Allen & Rocks, Inc.* in support of that proposition ("Code § 8.01-45 plainly requires that the words used must not only be insults, but they must also 'tend to violence and breach of the peace'."), *id.* at 442, 477 S.E.2d at 742, leads to such a conclusion. In fact, the *Allen & Rocks, Inc.* court went on to discuss various requirements for defamation actions. *Id.* at 442-43, 477 S.E.2d at 742-43. Furthermore, the *Allen & Rocks, Inc.* Court made the statement, cited by *Hutchins* in support of its conclusion, in addressing plaintiff's contention that precedent had eliminated the "statutory necessity of showing that the insults must be those that would lead to violence or breach of the peace," Allen *& Rocks, Inc.*, 252 Va. at 442, 477 S.E.2d at 742, *not* in the context of discussing the elements required for a cause of action pursuant to Va. Code § 8.01-45. While the Virginia Supreme Court has recognized that it is possible, from a constitutional standpoint, for a pure expression of opinion amounting to fighting words to be actionable, *Chaves v. Johnson*, 230 Va. 112, 119, 335 S.E.2d 97, 101-02 (1985), and while the plain language of Va. Code § 8.01-45 appears to create a true "fighting words" cause of action, the Virginia Supreme Court has consistently imported defamation principles (other than publication) into the statutory insulting words cause of action at Va. Code § 8.01-45. That appears to be the state of the law in Virginia at this time, and this Court is bound by such precedent.

*Yeagle* Court went on to note that "[i]n considering the type of speech that falls beyond that which can support a defamation action, the United States Supreme Court has recognized that speakers may use language that is insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole'." *Id.* Examples of rhetorical hyperbole cited in *Yeagle* include referring to the negotiating position of a real estate developer as "blackmail," defining a labor union "scab" to be a "traitor," and publishing a parody of an advertisement referring to a public figure. *Id.* The Court in *Yeagle* said that, in each of those instances, "no reasonable inference could be drawn that the individual identified in the statements, as a matter of fact, engaged in the conduct described," and that the "statements could not reasonably be understood to convey a false representation of fact." *Id.*

The *Yeagle* Court went on to rely upon its prior decision in *Crawford v. United Steel Workers, AFL-CIO*, 230 Va. 217, 234-35, 335 S.E.2d 828, 839 (1985), *cert. denied*, 475 U.S. 1095 (1986), noting that "we have recognized that words used to describe a member of a labor union in the course of a labor dispute, while 'disgusting, abusive, [and] repulsive,' will not support a cause of action for defamation, for the same reason, they could not 'reasonably be understood . . . to convey a false representation of fact'." *Yeagle*, 255 Va. at 293, 497 S.E.2d at 137. In *Crawford*, slang terms were hurled at plaintiffs as they tried to cross labor picket lines. Among the names hurled at defendants were "cocksucker" and "motherfucker." *Crawford*, 230 Va. at 234-35, 335 S.E.2d at 838-39. While the *trial* court found that several other offensive curse words did not support liability under the insulting words statute, it did find that these two words supported liability under the statute. In reviewing that decision, the Virginia Supreme Court in *Crawford* concluded that these words "will not support recovery," stating that "[t]he words are disgusting, abusive, repulsive, and are in no way condoned by this Court." *Id.* However, the Court went to state that "[n]evertheless, they cannot reasonably be understood, under the circumstances of this labor dispute, to convey a false representation of fact." *Id.* The Court concluded that calling "a person a 'cocksucker' does not, under the circumstances of this labor dispute, convey the false representation that the individual engaged in sodomy. Nor does calling a person a 'motherfucker,' under the circumstances of this case, convey the false representation that the person engaged in incest." *Id.*

While it is true that the *Crawford* statements took place in the context of a labor dispute where federal labor law grants some protection to picketers, the Virginia Supreme Court has more recently affirmed the requirement of falsity evidenced in the *Crawford* decision. The Court in *Yeagle* said that "[w]hile *Crawford* involved statements made in the context of a labor dispute which,

under federal law, requires a wider tolerance of rhetoric which might otherwise support an action for defamation, the case nevertheless reaffirms that, to be actionable, the alleged defamatory statements must still be understood to convey a false representation of fact." *Yeagle*, 255 Va. at 293, 497 S.E.2d at 137. The *Yeagle* Court cited *Polish Am. Immigration Relief Comm., Inc. v. Relax*, 189 A.D.2d 370, 373-74, 596 N.Y.S.2d 756, 758-59 (1993), in support of its statement that rhetorical hyperbole in a non-labor context will not support a claim for defamation. In *Relax*, a Polish immigrant made statements in an interview and a letter written about a Polish relief organization, calling it a "madhouse" made up of "false do-gooders" and "thieves who should have been put to prison long ago." *Id.* The *Relax* court similarly concluded that the words were "clearly rhetorical hyperbole and vigorous epithet, and thus constitute nonactionable expressions of opinion under Federal or State constitutional standards." *Id.*

Just as the Court in *Crawford* found that calling a person a "motherfucker" under the circumstances of that case did not convey the false representation that the person engaged in incest, this Court must conclude that using that same word, in the context described by plaintiff, fails to convey the false representation that the person engaged in incest. *See Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1404 (1999) (use of curse words such as motherfucker are epithets and subjective expressions of disapproval devoid of any factual content). Similarly, the use of the word "stupid" in conjunction with "motherfucker," screamed at Jarrett in front of other employees in the employment context, cannot be understood to convey the false representation that the plaintiff lacked normal mental capacity. *See Chang v. Cargill, Inc.*, 168 F. Supp. 2d 1003, 1011 (D. Minn. 2001) (recognizing use of word "stupid" as opinion statement that is not actionable defamatory word); *see also Kilcoyne v. Plain Dealer Publ. Co.*, 112 Ohio App. 3d 229, 236, 678 N.E.2d 581, 585 (1996) (recognizing use of word "stupid" to be rhetorical hyperbole). This Court cannot emphasize strongly enough its disdain and condemnation for the use of this language in the employment context, or anywhere else for that matter, but the controlling precedent in the Commonwealth of Virginia requires the Court to sustain defendant Goldman's demurrer, as well as Viacom's demurrer to the vicarious liability claim based upon the same statement.

As a result of this ruling, it is unnecessary to address defendant's additional arguments.

## 2. Webb

Jarrett next alleges that, in May 2003, Webb, while standing face-to-face with Jarrett, screamed "you are a fucking idiot" to Jarrett, and that this outburst took place in the vicinity and hearing of other Viacom employees. Webb argues that Jarrett's insulting words claim fails because the allegedly insulting words are not provably false and defamatory.

Just as noted above, the Court need not here rehash the applicable law stated above with regard to Jarrett insulting words claim against Webb. The same principles of law apply here. Just as the Court in *Crawford* found that calling a person a "motherfucker" under the circumstances of that case did not convey the false representation that the person engaged in incest, this Court must conclude that using a portion of that same word, in the context described by plaintiff, fails to convey the false representation that the person engaged in some sexual act. Similarly, the use of the word "idiot" in conjunction with "fucking," screamed at Jarrett in front of other employees in the employment context, cannot be understood to convey the false representation that the plaintiff lacked normal mental capacity. *See Chang v. Cargil, Inc.*, 168 F. Supp. 2d 1003, 1011 (D. Minn. 2001) (recognizing use of word "idiot" as opinion statement that is not actionable defamatory word). Again, this Court cannot emphasize strongly enough its disdain and condemnation for the use of this language in the employment context, or anywhere else for that matter, but the controlling precedent in the Commonwealth of Virginia requires the Court to sustain defendant Webb's demurrer, as well as Viacom's demurrer to the vicarious liability claim based upon the same statement.

As a result of this ruling, it is unnecessary to address defendants' additional arguments.

## E. Breach of Implied Contract

Jarrett alleges that "Viacom's Business Conduct Statement constitutes an implied contract, for which there was an offer by Defendant Viacom, an acceptance of that offer by Plaintiff Jarrett, and consideration." Jarrett further alleges that Viacom breached this contract by terminating Jarrett in retaliation for his complaint concerning violation of Viacom's harassment-free workplace policy contained in Viacom's Policy Manual.

The Court previously granted a defense motion craving oyer of Jarrett's August 21, 2000, employment application and his July 18, 2002, Acknowledgement form for receipt of Viacom's Human Resources Policy Manual. Furthermore, when Jarrett filed his amended motion for judgment, he

attached Viacom's Business Conduct Statement and the cover letter he alleged was distributed with the Policy Manual.

Virginia courts have consistently described the traditional employment relationship as one "at will." This concept was expressed by the Virginia Supreme Court in *Miller v. SEVAMP, Inc.*, 234 Va. 462, 465, 362 S.E.2d 915, 917 (1987), where the Court said that "Virginia adheres to the common-law rule that, when the intended duration of a contract for the rendition of services cannot be determined by fair inference from the terms of the contract, then either party is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice." Therefore, though it is described as "at-will," the employment relationship is a contractual one. *Layton v. MMM Design Group*, 32 Fed. Appx. 677, 2002 U.S. App. LEXIS 5789, **12 (4th Cir. 2002) (unpublished disposition) (one may have "an express written contract for at-will employment"); *see also Setliff v. Akins*, 2000 S.D. 124, *P21, n. 4, 616 N.W.2d 878, 887, n. 4.(2000) (an at-will employee can have an implied contract with his employer on terms other than the at-will status).

The plain language of the employment application signed by Jarrett on August 21, 2000, indicates as follows:

> If employed, and in consideration of my employment, my signature below certifies that the following statement shall be a part of the employment agreement between Paramount [now Viacom] and me, and shall be binding on me: (a) my employment will not be for any specific period of time; (b) my employment may be terminated at any time, with or without notice, at the will of either myself or Paramount; (c) this agreement concerning my at-will status contains the entire understanding of me and Paramount concerning the duration of my employment and the circumstances under which my employment may be terminated, and supersedes all prior agreements and representations concerning my employment with Paramount; and (d) my employment at-will status cannot be changed by any employee or representative of Paramount except in a writing signed by me and the senior human resources executive of Paramount.

The application also reflects that Jarrett was seeking regular employment as an "Account Executive (Sales)."

Jarrett subsequently, on July 18, 2002, signed an "Acknowledgment" form indicating he had received "a copy of the Viacom Television Stations

Human Resources Policy Manual dated June 2002." This Acknowledgment form further indicates that:

> The Policy Manual does not constitute a contract and there is no change in the at-will status of employees. Any written agreement (contract) between an employee and Viacom Television Stations that alters these policies must be signed by the appropriate senior management and approved by the Senior Vice President, Human Resources. These agreements can only be signed by the President, Viacom Television Stations Group.

According to the allegation in Jarrett's Amended Motion for Judgment, he was also provided with the Viacom Business Conduct Statement, pursuant to which he made a complaint in July 2003 concerning harassment, abusive language, gender, age, and salary discrimination. Jarrett alleges this complaint resulted in his termination and that such alleged retaliatory discharge constitutes a breach of his employment contract because the Business Conduct Statement directs employees to file such complaints and specifically prohibits retaliation. Viacom counters that Jarrett's at-will employment was not altered by the Business Conduct Statement's complaint procedure and prohibition on retaliation for the filing of such complaints.

Employee handbooks can, in certain circumstances, confer contractual rights. *Michael v. Sentara Health System*, 939 F. Supp. 1220, 1236 (1996). However, where a specific disclaimer is included in an employment application and policy manual acknowledgment, as here, a handbook such as the Business Conduct Statement fails to override the disclaimer. As the court noted in *Michael*, "a clearer expression of intent to create at-will employment can hardly be imagined." *Id*. Nothing in the Business Conduct Statement indicates an intention to override these disclaimers. As the Court said in *Vizi v. Dulles Orthopaedic Group, P.C.*, 63 Va. Cir. 158, 162 (Loudoun County 2003), "[i]f the question of whether the employment is at-will or for a definite term goes to a jury only if the evidence concerning the terms of the contract of employment is in conflict, then it seems to me that a motion for judgment for breach of an employment contract must at least present some factual allegation (as opposed to a legal conclusion) that the contract is one for a definite term in order to survive a demurrer." Jarrett has made conclusory assertions that the language of the Business Conduct Statement created a contractual term that overrode the other disclaimers he signed. However, his failure to allege facts showing a "clear intent" to convert the at-will employment relationship into a termination-for-cause contract, even at the demurrer stage, requires this Court

to sustain Viacom's demurrer. *Graham v. Central Fidelity Bank*, 245 Va. 395, 400, 428 S.E.2d 916, 918 (1993).

This Court also finds persuasive Viacom's argument that Viacom's distribution of its anti-harassment and anti-retaliation policies cannot support formation of a contract between Viacom and Jarrett. As the court noted in *Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 83-84 (D. Conn. 2000), "[a]s any promises in the policy are general statements of adherence to the anti-discrimination laws, standing alone they do not create a separate and independent contractual obligation." If the Court were to accept Jarrett's argument that distribution of the Business Conduct Statement (containing anti-harassment policies and complaint procedures) created additional contractual terms overriding a specific disclaimer, any employer that distributed documents reflecting federal and state discrimination law would have created a new contractual term. Much more than that is needed to create such contractual terms. The essential elements of a contract are offer and acceptance, with valuable consideration. *Montana v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980). Applying the objective theory of contract, which controls in Virginia, it cannot be said (without more) that a reasonable person in Jarrett's position would believe that the Business Conduct Statement had invited his acceptance to add additional terms to his contract and override the existing disclaimers. *See Chang v. First Colonial Savings Bank*, 242 Va. 388, 391-92, 410 S.E.2d 928, 931 (1991) (where an offer is clear, definite, and explicit, and leaves nothing open for negotiation, it constitutes an offer, acceptance of which will complete the contract). Jarrett has failed to allege facts showing a clear intent to extend an offer of additional contractual terms, and, having found that there was no credible allegation of consideration, it is appropriate to sustain Viacom's demurrer to Jarrett's claim for breach of implied contract.

Because of the Court's ruling, it is not necessary to address defendants' additional arguments.

## III. Conclusion

The demurrers of Goldman, Webb, Viacom, and Ward are sustained. The objections to this Opinion and Order, as stated in the pleadings and briefs, and at oral argument on the record, are preserved and exceptions are noted on such basis. Such argument having also been reviewed in this Opinion and Order, the Court dispenses with the Va. Sup. Ct. R. 1:13 counsel endorsement requirement. The briefs of the parties are ordered filed. Because the Court has previously permitted plaintiff to amend his motion for judgment, the Court dismisses plaintiff's amended motion for judgment. *See Mortarino v. Consultant Eng'g Services*, 251 Va. 289, 296, 467 S.E.2d 778, 782 (1996). It is so ordered.